IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 7, 2008

**STATE OF TENNESSEE  v. WILLIAM GLENN WILEY**

**Direct Appeal from the Circuit Court for Davidson County**
**No. 95-C-1918    Walter C. Kurtz, Judge**

**No. M2007-01299-CCA-R3-CD  - Filed September 29, 2009**

At the conclusion of his second trial, Defendant-Appellant, William Glenn Wiley (hereinafter "Wiley") was convicted by a Davidson County jury of first degree felony murder and especially aggravated robbery. The jury sentenced him to life imprisonment without the possibility of parole for the felony murder conviction, and the trial court sentenced him as a Range I, standard offender to a concurrent twenty-year sentence for the especially aggravated robbery conviction. On appeal, Wiley argues that: (1) the trial court erred in denying his motion for judgment of acquittal when the evidence was insufficient to convict him of first degree felony murder and especially aggravated robbery; (2) he should be granted a new trial because of several violations of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963); (3) he should be granted a new trial because of several Tennessee Rule of Criminal Procedure 16 violations; (4) the trial court erred by admitting into evidence his Knights Inn employment application and Arrowhead Motel receipt; (5) the trial court erred in admitting prior bad act evidence in the form of Michelle Scheffel's testimony and rebuttal evidence of a prior assault;(6) his sentence of life imprisonment without the possibility of parole is excessive; and (7) the trial court erred in denying his request for co-counsel. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., joined. D. KELLY THOMAS, JR., J., filed a concurring opinion.

Lindsay C. Barrett, Nashville, Tennessee (on appeal);  Jodie A. Bell and Manuel B. Russ, Nashville, Tennessee (at trial) for the defendant-appellant, William Glenn Wiley.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; Victor S. Johnson, III, District Attorney General;  John C. Zimmerman and Shannon E. Poindexter, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This case concerns the death and robbery of Frank Andrews at the Knights Inn in Nashville, Tennessee, on or about June 5, 1995, or June 6, 1995. The victim sustained blunt force trauma to his head; however, the medical experts disagreed as to the victim's cause of death.

At the conclusion of his first trial, Wiley was convicted by a Davidson County jury of first degree felony murder and especially aggravated robbery. The jury sentenced him to life imprisonment without the possibility of parole for the felony murder conviction, and the trial court sentenced him to a concurrent twenty-five-year sentence for the especially aggravated robbery conviction. On direct appeal, this court affirmed the trial court's judgments, and the Tennessee Supreme Court declined Wiley's application for permission to appeal. State v. William Glenn Wiley, No. M1999-02487-CCA-R3-CD, 2001 WL 400390 (Tenn. Crim. App., at Nashville, Apr. 21, 2001), perm. app. denied (Tenn. Oct. 8, 2001).

Wiley filed a petition for post-conviction relief. Because the trial court failed to instruct the jury on second degree murder as a lesser-included offense of first degree felony murder, the post-conviction court granted Wiley a new trial on the felony murder conviction but failed to grant Wiley relief on the conviction of especially aggravated robbery. The State appealed, and Wiley cross-appealed. This court affirmed the post-conviction court's judgment, concluding that State v. Ely, 48 S.W.3d 710 (Tenn. 2001), applied retroactively on collateral review. William Glenn Wiley v. State, No. M2003-00661-CCA-R3-PC, 2004 WL 2185959 (Tenn. Crim. App, at Nashville, Sept. 23, 2004).

Wiley and the State filed applications for permission to appeal. The Tennessee Supreme Court granted both applications, reversed the judgment of the Tennessee Court of Criminal Appeals, and remanded the case for a new trial on both convictions. Wiley v. State, 183 S.W.3d 317, 335 (Tenn. 2006). In its opinion, the Tennessee Supreme Court held: "1) that State v. Burns[, 6 S.W.3d 453 (Tenn. 1999),] did not create a new constitutional rule that must be retroactively applied to post-conviction cases, 2) that the petitioner was not entitled to a new trial or other relief based on DNA results, and 3) that the petitioner was denied his constitutional right to effective assistance of counsel." Wiley, 183 S.W.3d at 335.

At the conclusion of his second trial, Wiley was again convicted by a Davidson County jury of first degree felony murder and especially aggravated robbery. The jury sentenced Wiley to life imprisonment without the possibility of parole on the felony murder conviction, and the trial court sentenced Wiley as a Range I, standard offender to a concurrent twenty-year sentence for the especially aggravated robbery conviction.

Wiley filed a timely motion for new trial. On April 19, 2007, and April 23, 2007, he filed amended motions for new trial. The trial court denied the motions for new trial. Wiley filed a timely notice of appeal.

As one of his issues Wiley challenges the sufficiency of the evidence supporting his convictions. A brief summary of the thirteen witnesses called by the State and the eight witnesses called by the defense during trial is therefore necessary.

**Trial.** Betty Andrews, the victim's mother, testified that the victim, Frank Andrews, moved from Orlando, Florida, to Nashville, Tennessee, in June of 2005 with the hope of becoming a famous musician. Andrews said that the last time she talked to her son was the Saturday before his death. Approximately two weeks before her son moved to Nashville, he received a settlement for his injuries from a car wreck. Andrews stated that her son regularly carried a wallet and a money clip in his pockets. She stated that her son had many health problems throughout his life and that her son had been released from the hospital for a blood clot in his left leg approximately one week before his death. She also said that her son was an alcoholic, was 37, and was approximately five foot seven or eight inches tall and weighed between 130 and 137 pounds at the time of his death. He was in poor health when he moved to Nashville.

Jim Stevens, a lieutenant with the Metropolitan Nashville Police Department's Strategic Development Division, testified that he was a Master Patrol Officer at the time he worked on this case. On June 6, 1995, at approximately 5:00 or 5:30 p.m., he and Officer David Korman, a trainee, were dispatched to Room 309 at the Knights Inn at 1360 Brick Church Pike in Davidson County, Tennessee. Lieutenant Stevens stated that he found the victim's body partially submerged in the bath tub with the head face down in the toilet. At the time, he could not tell whether the victim was male or female because of the victim's long hair and small frame. As they entered the room, he noticed that there was a large blood stain and broken glass on the bed. He noted that the position of the body did not look natural, and he saw a cord and wadded money and a small amount of blood in the tub. There was blood in the toilet, but he did not see any vomit in or around the toilet. He checked the body for a pulse, and then he and Officer Korman backed out of the hotel room. As they were leaving the room, Lt. Stevens said that he noticed that there were also a few small pieces of glass on the floor and a towel with blood on it next to an air conditioner near the door. As they were exiting the room, medical personnel arrived. He accompanied one of the medical personnel to do an examination of the body after telling the individual not to touch anything in the room.

Lieutenant Stevens said it was his job to preserve the crime scene, rather than to investigate it. He positioned Officer Korman in front of the door to the hotel room so that no one other than law enforcement entered the room. He also told Officer Korman to keep a log of the detectives and investigators that entered and exited the room. Once he established the crime scene perimeter at the front door to the hotel room, he called the identification technicians, the homicide investigators, and his sergeant to the crime scene. Once the homicide investigators arrived, they asked him to extend the crime scene perimeter to the entire third floor of the hotel.

Johnny L. Hunter, a retired sergeant with the Metropolitan Nashville Police Department, testified that he was a crime scene investigator at the time that he responded to the scene at the Knights Inn at 6:00 p.m. on June 6, 1995. When he entered the room, he saw a large area of blood and some broken glass on one of the beds. He said the victim was in the bathtub "with his head over

-3-

the toilet, almost in the toilet." The victim's hair was wet, and he had a significant amount of blood on the hem of his shirt. The victim's pockets had been pulled inside out, and there was a closed pocket knife on the floor near his waist. The bathtub had smears of blood on it, and he observed two cords, a telephone cord and an electrical cord from the lamp in the room, in the bathtub. There was also a footprint in blood at the end of the tub. He also observed a towel with blood on it next to the air conditioner and a broken bottle on the floor outside the bathroom near the beds. He supervised the collection and documentation of evidence from the room. Hunter identified several photographs of the victim, which depicted the victim's face and head with lacerations on the top left temple and lacerations on the back of the head, the victim's hand with blood on it, and the victim's arms with abrasions on his left and right elbows.

Tommy Simpkins, an officer with the identification department of the Metropolitan Nashville Police Department, testified that he arrived at the crime scene on June 6, 1995, and helped collect evidence from Room 309. This evidence included a towel with blood on it, an electrical cord, a telephone cord, money, a pocketknife, and a suitcase. The telephone cord was tan in color and had been tied in knots to form loops. The electrical cord was black in color, had been cut several times, and had been tied in knots. Both cords were found in the bathtub. He said he also took some photographs of Room 325 because it was believed that the suspects may have been staying there. In addition, he collected a pair of size nine work boots with a substance appearing to be blood across the top of one of the toes found in Room 201, which was a floor below where the victim was found. The boots were not sent to TBI to be tested.

Marsha Brown, an officer for the crime scene investigation unit of the Metro Nashville Police Department at the time that she investigated this case, testified that she was called to the Knights Inn on June 6, 1995, to investigate a murder. Upon entering the crime scene in Room 309, she noticed a large pool of blood and broken glass from a juice bottle on the bed closest to the bathroom, broken glass from a juice bottle between that bed and the wall, a broken vodka bottle in front of the dresser, and trash in the room. She also saw a bloody towel next to the air conditioner. In the bathroom, she saw the victim's body in the bathtub with his head over the commode. The victim had blood on one of his feet. There was also money, an electrical cord, and a telephone cord in the bathtub. She identified the telephone cord in the bathtub as being from the telephone in Room 309. There was a pocket knife on the bathroom floor near the victim. She also collected a bottle of medication and numerous pills found in a suitcase. Officer Brown collected latent fingerprints from a beer can on the night stand and the broken vodka bottle next to the dresser in Room 309. She also investigated Room 325, where she noticed beer cans, beer boxes, and that the beds were made. Officer Brown photographed a pair of work boots in front of Room 201 that appeared to have blood on them. She was unsure whether these boots were ever sent to TBI to be tested. Officer Brown stated that there was no forced entry into Room 309.

Julia Hooper, a police identification supervisor with the Metropolitan Nashville Police Department, was tendered as an expert in fingerprint examination. She determined that fingerprints taken from the broken vodka bottle and a beer can on the nightstand belonged to Wiley. Hooper said that she was never asked to make a comparison of the prints collected with known prints belonging

to Scheffel and the victim. She said there were several other identifiable prints taken from Rooms 309 and 325 that did not match Wiley's known fingerprints. These identifiable prints were saved to the AFIS system in the computer so that future matches of these prints could be made.

James Walker, a detective with the Evansville, Indiana Police Department, testified on June 25, 1995, he was notified that Wiley had been arrested at the Arrowhead Motel in Evansville, Indiana. His department notified the Metropolitan Nashville Police Department that Wiley was in their custody, and Wiley was extradited to Nashville.

Larry Flair, a retired detective with the Homicide/Murder Squad Division of the Metropolitan Nashville Police Department, testified that he was dispatched on June 6, 1995, to Room 309 at the Knights Inn. After arriving at the crime scene, he was told that Wiley, the caretaker for the motel, and Michelle Scheffel, Wiley's girlfriend, had begun working at the motel on June 1, 1995 and had left the day of the murder. Prior to their departure, Wiley and Scheffel had stayed in Room 325. Flair reviewed the motel's employment records and obtained a copy of Wiley's employment application from the motel manager. He identified the employment application as the one he received from the motel manager. Flair attempted to locate Wiley at the motel and at some of the addresses listed on his application but was unsuccessful. He was later notified by another officer that Wiley's fingerprints had been found in Room 309. Thereafter, he obtained a warrant for Wiley's arrest, which was loaded on the computerized NCIC system. Shortly thereafter, Flair received notice that Wiley had been arrested in Evansville, Indiana. He then took Wiley into custody in Indiana. Flair identified Wiley for the court.

After receiving information about Wiley's arrest in Evansville, Flair obtained the registration receipt from the Arrowhead Motel in Evansville, Indiana, which showed that Wiley and Scheffel checked into the motel on June 23, 1995. He identified the receipt as the document that he received from the Arrowhead Motel.

Flair said that he took Wiley into custody in Indiana on June 25, 1995. He then obtained permission from Michelle Scheffel to search the room she and Wiley shared at the Arrowhead Motel, wherein he discovered some of Wiley's personal documents. Flair stated that Wiley used his own name, rather than an alias, when he registered for the room at the Arrowhead Motel. Flair also identified a pair of size 11 work boots found in Wiley's room at the Arrowhead Motel. He also identified a second pair of boots found in that motel room, and although they did not have a size on them, they were only slightly shorter than the size 11 boots he had previously identified. Flair stated that the car in the parking lot of the motel was registered to Wiley.

Dr. Ann Bucholtz testified that she was the chief medical examiner for Davidson County in June of 1995. She was tendered as an expert in forensic pathology. Dr. Bucholtz performed the victim's autopsy and concluded that his cause of death was blunt force trauma to the head. She observed several lacerations on the victim's scalp area, including one larger laceration and four other superficial lacerations with bruises underneath in the area of the crown. She identified two curved abrasions above the victim's right eyebrow that looked as if they occurred near death or after death.

Dr. Bucholtz stated that the victim's injuries were consistent with being hit in the head with a bottle. She also stated that the injuries indicated that the victim had suffered at least two different blows to the head. The victim's neck had no injuries, although she found evidence that the victim's neck had been resting against an object. Dr. Bucholtz opined that the injuries to the victim's elbows, hands, and the back of his hands could have been defensive wounds. There was no evidence of a heart attack. There was also no trauma to the neck. She stated that although the victim did not have any physical signs of seizure, this did not mean that a seizure did not occur. She said that it is very difficult to determine whether a person died of a seizure because a seizure is not easily observed and documented in an autopsy. The victim's vascular system was normal, and there was no sign of an aneurism. There were no signs that the victim died of acute intoxication. Although the victim did not have a fractured skull, he had bruising on the scalp that confirmed the outside bruising she observed on the skin related to the abrasions above his eyebrow. Dr. Bucholtz's microscopic examination also confirmed that the victim died of blunt force trauma. She stated that although the victim had a blood alcohol level of .34, this amount would not necessarily have been fatal to him if the victim was a chronic drinker. Dr. Bucholtz said that she did not recall having information that the victim had a seizure disorder at the time of the autopsy. When asked about whether the victim could have died of positional asphyxia or hanging, Dr. Bucholtz maintained that the victim's cause of death was blunt force trauma. She stated, "[T]here were no other findings I thought were significant in an autopsy to cause the death." Although alcohol or a seizure could have contributed to the victim's death, Dr. Bucholtz said, "[T]he final cause of death in my opinion is still blunt force trauma." She said that she was unable to change her opinion as to the victim's cause of death based on the evidence presented to her during cross-examination.

Michelle Scheffel, Wiley's former girlfriend, testified that in June of 1995 she and Wiley had a child who was two or three months old. She identified Wiley for the court. She state and she and Wiley worked at the Knights Inn for approximately one week before leaving. While they were at the Knights Inn, she met the victim, although she did not know his name. The day they left the Knights Inn, she had seen the victim and Wiley drinking beer in the motel room that she shared with Wiley. She and Wiley got into a "little bit of a physical fight" because she wanted the keys to the car to go get some cigarettes. The victim told Wiley to leave her alone and take his hands off of her, and Wiley let go of her. Wiley and the victim left the room. Approximately an hour later, Scheffel took her baby and went to the victim's room to look for Wiley so that she could get some cigarettes. When she knocked on the victim's room, no one answered the door. When she came back a short time later and knocked on the door again, Wiley pulled her inside, and she saw Wiley and the victim fighting. Once she entered the room, Wiley and the victim continued fighting, although she could not determine what they were fighting about. Then she saw Wiley hit the victim on the head with a bottle, which knocked him to the floor. Although she did not initially see any injuries to the victim when she first entered his room, the victim began bleeding when Wiley hit him with the bottle. She did not notice any injuries to Wiley while she was in the victim's room. When Wiley hit the victim with the bottle, glass from the bottle shattered everywhere, and Scheffel took her baby back to their room. Scheffel said that she cleaned the victim's room everyday as a part of her job as housekeeper, and she never noticed any cut cords or damaged property. About fifteen to twenty minutes after she left the victim's room, Wiley came to their motel room and told her that the victim was calling the

police and that they had to leave. Scheffel said that Wiley owned a buck knife that he carried in his pocket. She also stated that the victim was "a lot smaller" than Wiley. She believed the victim weighed approximately 150 pounds, although the autopsy report said that he weighed 187 pounds.

Wiley never told her what happened between him and the victim after she had left the victim's room. She noticed that Wiley had some small cuts on his knuckles and a few blood splatters on his shirt when he returned to their room. Scheffel grabbed some of the baby's things and went to sit in the car. Wiley packed the rest of their belongings, put them in the car, and they left the Knights Inn to go to Clarksville. They made one stop, where Wiley changed his clothes, and he threw the clothes he had been wearing into the garbage bag full of their belongings. Scheffel also remembered Wiley throwing what she thought was a wallet out of the window. She said that they had only a few dollars when they left the Knights Inn, and she believed that they left the Knights Inn without their paychecks. She and Wiley spent a few nights at a motel in Clarksville before camping for two or three weeks at the Land Between the Lakes. From there, they drove to Evansville, Indiana, and stopped at the Arrowhead Motel. After staying there for a while, she heard a knock on their room at the Arrowhead Motel. She answered the door and saw several Evansville police officers with their guns drawn. They ordered Scheffel to the ground; she told them there was a baby inside, and they lowered their weapons. The officers made Scheffel sit near their police cars and told her to write down everything that had happened because her mother had filed a missing persons report. When the officers later interviewed her, they told her that Wiley was a suspect in a murder in Nashville, Tennessee. They asked her what she knew about the murder, and she told them that she did not know the victim and did not know anything about his murder, which was not the truth. She talked to Wiley after she talked to the Evansville Police Department because she wanted some answers about what was happening. Wiley told her only that the police had him now, and he was going to prison. Wiley urged Scheffel to stay with his mother, who was at the police station, for a little while, which she did. At about 12:45 a.m. or 1:45 a.m., Scheffel spoke to officers from the Metropolitan Nashville Police Department and again stated that she did not know anything about the victim's murder. She said Wiley never told her what happened between him and the victim in the motel room after she left.

After Wiley was transported to Nashville, Scheffel gave a tape recorded statement to Detective West in Nashville that varied from the other two statements she had given to the Nashville and Evansville officers. She told Detective West that she had seen the victim, and she described what she had seen in the victim's motel room before she left. She explained the reason that she had previously been untruthful to the Evansville and Metro Nashville officers:

I was scared, in shock, I didn't know what to say. And after, you know, I had time to think about it, it started to wear on me. And [Detective] West, he was, he seemed to be nice, and he told me if I had any information to give him a call and he would sit down and talk with me, and so I gave him a call.

Scheffel admitted that she had been charged with simple marijuana possession several years before, but this charge was expunged after she called a probation officer for six months. She also

became aware that she had written three checks to Walmart in 1996 for insufficient funds when she tried to buy a house. She repaid Walmart and was never formally charged regarding the checks.

Scheffel acknowledged that she told Detective George in Evansville that she and Wiley met another couple that were taking over the maid and groundskeeper positions at the Knights Inn and that Wiley told her to pack up her belongings because they were leaving the motel. She also admitted telling Detective West in Nashville that she and Wiley left the motel because they had met the other couple taking over their jobs, and there was no point in working if they were going to get fired at the end of the week. She also told Detective West that she did not see Wiley hit anyone with a vodka bottle and did not see Wiley throw a billfold out of the window of the car on June 25, 1995.

Glen John Glenn, a special agent forensic scientist with the Tennessee Bureau of Investigation (TBI) Crime Laboratory of Nashville, testified that he generated a report on the substances submitted by law enforcement in this case. He identified twenty-seven tablets as Phenobarbital, a controlled substance. He also identified several exhibits containing pills that were controlled substances, including Methyltestosterone, Lorazepam, and Alprazolam.

Bradley Everett, a special agent forensic scientist with the TBI Crime Laboratory in the serology unit, testified that he was required to test a white towel containing blood obtained by law enforcement in this case. Agent Everett stated that he was asked to compare the blood on the white towel with a sample of Wiley's blood. After conducting DNA testing, he concluded that the blood on the towel belonged to Wiley.

Wiley testified that in 1995 he was twenty-eight years old, and he and Michelle Scheffel were dating and had a young child together. He, Scheffel, and the baby moved to Nashville so that he could look for a job and be closer to his mother who lived in Greenville, Kentucky. They first worked at the Scottish Inn in Nashville. They stayed at this motel for only three days because Scheffel did not like her housekeeping job. Then they began working at the Knights Inn on a one-week trial basis; Scheffel worked as a housekeeper, and he worked as a groundskeeper. Their work paid their rent, and "if there was some extra, we [received] money for it." Wiley said that he and Scheffel discovered that management had hired another couple to replace them at the end of the week. Wiley said that his job required very little work and that he spent most of his free time drinking. He also said that he had a drinking problem at the time and drank a case of beer a day.

Wiley said that he met the victim at the Knights Inn when he was sitting by the pool drinking beer. Wiley and the victim drank together for a couple of hours and then went to the liquor store and bought a bottle of vodka and some beer. They drank in Wiley's room for a while until Scheffel came in the room, and Scheffel and Wiley had a verbal argument. Wiley said, "I have never put my hands on no woman, never been arrested for no domestic violence, or nothing like that." Wiley said he and the victim decided to go to the victim's room to get away from Scheffel. After arriving at the victim's room, they drank Busch beer, Budweiser beer, and vodka. After they had been at the victim's room for an hour, two women that he believed were prostitutes knocked on the door. The victim talked to them a minute, gave them some money, and told them to come back later that night.

The victim knew the women, and it appeared that the women had been at his room the night before. Wiley and the victim continued to drink, and the victim had a blackout, wherein the victim asked Wiley to give him some money to buy drugs and believed Wiley was a cab driver. Wiley and the victim started arguing, and then the victim "rushed" Wiley. Wiley said that he was intoxicated at that time, and the victim was angry and intoxicated. Wiley said that when the victim "rushed" him, he hit the dresser with the back of his legs, which made him sit down. The victim was "pushing [him] and swinging, [and Wiley] bowed backwards and . . . was trying to push up off the dresser." Wiley felt the vodka bottle with one of his hands, and he hit the victim one time on the head, but the blow "never phased him." Wiley said the victim continued to swing at him. Wiley hit the victim a second time with the vodka bottle, and the victim fell backwards on the bed. Wiley claimed the vodka bottle did not break until the second time he hit the victim with it . He denied hitting Wiley with the orange juice bottle that was found broken in the victim's room and said he did not know how the orange juice bottle had been broken. Wiley said he hit the victim two times because "[h]e had me off balance, and he was in drunken rage. I mean, it was like [he had] unbelievable strength." Then the victim "raised up" from the bed and tried to say something. Wiley told him he was leaving, and the victim kept trying to talk to him. He saw that the victim was bleeding, and he helped him to the bathroom doorway. Wiley said that he hit the victim with the bottle a second time because "he was attacking me. He was bleeding. After he raised up off the bed, I [saw] he was bleeding. He seemed that he could use some help. I helped him to the bathroom." He said that getting the victim to the bathroom "was the extent of the help he needed " and that the victim walked there on his own. As he got to the bathroom, Wiley noticed his nose was bleeding in the bathroom mirror, and he took a towel out of the bathroom and cleaned the blood off of his nose. He said he did not have any cuts on his hand that were bleeding at the time. He left the victim in the doorway to the bathroom. Wiley said he did not remember seeing any electrical and telephone cords in the bathtub, and he had no idea how the cords got there. As he was leaving the motel room, he noticed the victim's wallet on the night stand, and he took the wallet and put it in his back pocket. The wallet contained $240, which he removed and put into his own pocket. He threw the towel in the room, picked up his cooler, and left. He said he took the victim's wallet to "get back [at him], drunk, I guess. He done attacked me, he done cost me my job, [so I] just walked over and picked it up." He said that he did not use force to take the victim's wallet because the victim was in the bathroom at the time. Wiley also said that when he hit the victim in self-defense, he did not intend to take anything from the victim. Wiley denied robbing the victim, emptying his pockets, and beating him up. He claimed he hit the victim with a vodka bottle "to get him off of me."

Wiley said that when he left the room, the victim "was alive, he was talking, he was bleeding, and he was intoxicated" He said he helped the victim because he knew what it was like to be a drunk. Wiley took the victim to the bathroom so that he could "clean up, sober up, whatever he needed to do."

When Wiley left the room, he, Scheffel, and the baby headed for Greenville, Kentucky, but Scheffel was driving, and they ended up in Clarksville. While they were driving on the interstate, Wiley took the victim's wallet and threw it out the window of the car along with some paper and some beer bottles. Wiley said he never changed out of his clothes with blood on them before

checking into the motel in Clarksville. He said that the clothes he had on when he left the victim's room had been washed with the rest of his clothes, and he kept the shoes he was wearing when he left the victim's room. Wiley said that the boots collected from the second floor of the Knights Inn that were introduced by defense counsel were not his boots. He said that he, Scheffel, and the baby spent one night at a motel in Clarksville and then went to his mother's home in Greenville. Then they went to the Kentucky Lake to camp. He said that he was not worried about the police looking for him after they left the Knights Inn. After they camped at the lake, he, Scheffel, and the baby returned to Wiley's mother's house. Wiley picked up his unemployment check, and then decided to go to Evansville, Indiana, because it was near his mother's home in Greenville, to see if he could find a job. Once they got to Evansville, they got a room at the Arrowhead Motel, where he was later arrested. Wiley said the officers knocked on the door, he answered it, and they had their guns raised and told him to come out of the room. The officers told Wiley they had a warrant for his arrest out of Nashville. He initially believed that this warrant was for theft. As he was taken to jail, an officer told Wiley that he had been arrested for murder, and Wiley told him that they had arrested the wrong person. Once he got to the police station, he was taken into custody by the Nashville police. Wiley believed that his mother told the police where to find him.

Wiley gave a tape-recorded statement to Detective West at the Evansville police station. They talked for an hour and a half before Detective West took a ten minute tape-recorded statement from him. Wiley was then extradited to Nashville.

Wiley acknowledged that he signed the job application at the Knights Inn. He stated that the glass bottle of orange juice was already in the room when they returned from the liquor store. Wiley said that he had never been in the victim's room prior to the time that he hit the victim with the vodka bottle.

Arthur Woods testified that he was in prison at the South Central Correctional Facility serving a seven to eight year sentence. Woods said that he met the victim in Nashville at the Ramada Inn Lounge. The victim told him that he had an audition on Music Row and said he needed a ride. Woods gave him a ride to Kroger and gave him his beeper number in case he needed a ride later. He said that the victim would give him gas money in exchange for transportation. Later, the victim contacted Woods and asked him to bring him a six pack of beer to his room. Woods brought him the beer and talked to the victim for a few minutes. He left, and a short time later, Woods learned that the victim was dead. Woods said that he only went to the victim's room one time. The police interviewed him because they found his beeper number in the victim's room. Woods said that he did not rob or kill the victim. He also said that he did not have a key to the victim's room.

Jeff West, an investigator with the Metropolitan Nashville Police Department in 1995, testified that he and Detective Larry Flair led the investigation in this case. West was dispatched to the Knights Inn on June 6, 1995, and attended the victim's autopsy the next day. West said that Dr. Bucholtz had told him that the victim's cause of death was blunt force trauma to the head. Because of Dr. Bucholtz's findings as to the cause of death, West obtained an arrest warrant for Wiley, charging him with the victim's homicide. West interviewed Wiley in Evansville, Indiana, where he

was arrested. He said that the officers in Evansville tape-recorded approximately five minutes of his interview with Wiley, although he talked with Wiley for approximately an hour.

Clifford W. Mann, a former detective in the homicide unit of the Metropolitan Nashville Police Department, testified that he investigated this case in 1995 and canvassed the area around the Knights Inn for witnesses. Mann called Dr. Conavey, who was listed on a pill bottle found in the victim's room, and asked for him to give him a call. Dr. Conavey told Mann that he was treating the victim for high blood pressure, a blood clot in his left leg, and an infection in his left ankle and had prescribed several medications for the victim. Dr. Conavey also told Mann that he believed the victim was addicted to painkillers. Mann also learned that Arthur Woods was acting as a cab driver for the victim shortly before his death. Mann interviewed Woods but was unable to confirm that Woods worked for any cab companies in Nashville. During his investigation, Woods learned that the last time the victim was seen alive was on June 5, 1995. Mann said that he turned all of his information about Arthur Woods and Dr. Conavey over to Detective West.

Dr. Murray Smith, who was tendered an expert in addiction medicine, testified that he was a consultant for the defense in this case. He considered the autopsy report, the testimony from the pathologist, and the drug testing and alcohol testing performed on the victim. He contacted Dr. Conavey, one of the victim's physicians, who told him that he had prescribed two anti-seizure medications, Dilantin and Phenobarbital, to the victim. Based on the date of the prescriptions and the number of pills remaining, Dr. Smith opined that the victim was not properly taking his anti-seizure medication, which put him in a high risk category to have a seizure. He also noted that the victim had an old injury that resulted in a scar on the right frontal lower part of his brain, which could have been the area where the victim's seizures began before spreading to the rest of his brain. He said that the toxicology report showed that the victim had a blood alcohol level of .34, which was over four times the legal limit. Dr. Smith stated that the victim was an alcoholic, and it was common for alcoholics to have seizures. He also stated that an alcoholic can have a seizure as they are going through withdrawal from the alcohol, even though they still have alcohol in their blood stream.

Dr. Smith stated that people who have major motor seizures often start thrashing or jerking, so it is important that they are positioned so that they can easily breathe. He also said that alcohol is a respiratory depressant, which makes a person less aware that they are not getting enough oxygen. He said that the position of the victim in the bathtub with his head over the edge of the toilet bowl was an unnatural position that could have compromised his ability to breathe. Dr. Smith stated that the combination of the victim's stress about the injuries and bleeding, his old brain injury, his high blood alcohol level, and his failure to take his anti-seizure medicine placed the victim in a very high risk category for a seizure. He said that even if the victim had been hit on the head, he still would have been at risk for a seizure. However, he explained that a failure to take anti-seizure medication does not guarantee that an individual will have a seizure. He said that the fact that the victim suffered blunt force trauma to his head made it more likely that he had a seizure.

Dr. O'Brien Cleary Smith, who was a former medical examiner and who was tendered as an expert in forensic pathology, testified that he acted as a consultant for the defense in this case. He

reviewed the medical examiner's report, the autopsy report, the motel room investigation, and the records regarding the victim's medical conditions. He stated that Dr. Bucholtz's report showed that it was a partial autopsy, rather than a full autopsy, because it failed to include the areas of the upper neck and tongue. He also claimed that Dr. Bucholtz did not properly document her findings during the autopsy. He felt the investigation of the motel room and the victim's medical history were incomplete.

Dr. O.C. Smith said that because of the victim's unnatural position in the bathtub with his head dangling over the commode, there was a possibility that the victim's breathing had been interrupted because of the compression of his neck. In his opinion, the victim's body was in a "lethal position." He said a person with a high alcohol level in the blood "runs the risk of irritating the heart, and the heart is more likely to enter into a lethal arrythmia.." He also stated that alcohol can depress the respiratory system and that if someone has a seizure disorder, this can cause the person to have a seizure. Dr. O.C. Smith said that he did not agree with Dr. Bucholtz's conclusion that the victim died of blunt force trauma to the head. He argued that Dr. Bucholtz "didn't leave enough documentation in there for me to have absolute confidence in what she said she saw."

Dr. O.C. Smith said that the evidence indicated that the victim could have died from spontaneous bleeding into the brain because of his alcoholism, from a subdural hematoma because of anticoagulant therapy, from a second impact to the head where there was an old injury, from his seizure disorder, or from postural asphyxia. However, he did not believe that the victim died because of alcohol poisoning because the evidence suggested that the victim had a tolerance to alcohol. He argued that Dr. Bucholtz should have removed the victim's tongue during the autopsy because the neck area becomes important because of the position of the victim's body.

Dr. O.C. Smith acknowledged that the information he reviewed indicated evidence of blunt force trauma. He also acknowledged that blunt force trauma can cause an accumulation of blood inside the skull, which could ultimately cause death. After reviewing the histology slides, Dr. O.C. Smith believed that Dr. Bucholtz removed the victim's brain first during the autopsy, which caused him concern:

> [A] classic mistake in forensic pathology, if there is a concern about bleeding in the head, the rest of the body should be opened first, because that pulls the blood down, the liquid blood down and out of the brain tissues, because the danger is, there is a lot of blood up there in the head area, and as soon as you make a cut in there, you can actually induce bleeding into the brain, leaking of blood into the brain but it can mimic things like subarachnoid hemorrhage very easily.

Dr. Bruce Phillip Levy, the Davidson County Medical Examiner, testified that he reviewed Dr. Bucholtz's autopsy in this case. He said that the autopsy was "a fairly typical standard medical examiner autopsy. I didn't notice any particular deficiencies in it at all." He characterized Dr. Bucholtz's work as "a complete autopsy." Dr. Levy concluded that the victim's cause of death was "blunt force injuries to his head" and that his injuries were consistent with being hit over the head

at least two times with a vodka bottle. He explained that the evidence he reviewed in this case was not consistent with the victim's dying of a seizure." Dr. Levy admitted that it is impossible to see evidence of a seizure death in an autopsy.

To rebut Wiley's testimony that he had never hit a woman, the State called Kimberly Wingate and Paul Snyder for impeachment purposes. Kimberly Wingate testified that at 11:00 p.m. on July 18, 1987, Wiley and another man walked up to her car in the parking lot of Ray's Grocery, pulled her out of her car, and threw her on the ground. Wiley then asked her, "What the [f---] do you have to say about that?" Wingate got the license plate number of the car in which Wiley and the other man left the scene, and she ran into the grocery store.

Paul Snyder testified that at 11:00 p.m. on July 18, 1987, he was in the parking lot of Ray's Grocery when he observed a large man pulling Kimberly Wingate out of her car and throwing her to the ground. Snyder said that this man was later identified as William Glenn Wiley. The trial court instructed the jury that they were to consider the testimony of Wingate and Snyder only as it related to the credibility of Wiley as a witness and not as evidence of guilt of the offenses with which Wiley was charged at trial.

## ANALYSIS

**I. Denial of Motion for Judgment of Acquittal and Sufficiency of the Evidence.** Wiley argues that the trial court improperly denied his motions for judgment of acquittal. He also argues that the evidence was insufficient to convict him of first degree felony murder and especially aggravated robbery. Specifically, he asserts that the State did not prove beyond reasonable doubt that Wiley took the victim's property through the use of a deadly weapon or that he killed the victim while committing the offense of aggravated robbery. He additionally argues that the victim's cause of death was far from certain and that there was no overwhelming evidence that Wiley was responsible for the victim's death. In response, the State argues that the evidence was more than sufficient to convict him of these two offenses.

At the close of the State's case in chief, the defense made a motion for judgment of acquittal. In support of the motion, it stated:

> As Your Honor knows, an especially aggravated robbery requires that . . . the defendant must obtain or exercise control over property owned by [the victim]. I don't even think they've proven that yet. While I may have made a statement in my opening about that, I don't think they've even met the burden on that. All they've managed to have, happen here, is mom to come in and say he regularly has a wallet and for someone to say a wallet wasn't in there. Ms. Scheffel couldn't say she saw a wallet. She said there was something there, I think it may have been a wallet in the console of the car, but you know, she didn't even say she saw a wallet for sure. So, I don't think they can even prove that he took the wallet.

-13-

Then there's the issue of whether or not Mr. Wiley intended to deprive [the victim] of any property. I don't think there has been any proof of that. I think there's been proof that they were two people in there, they were drunk, and they [were] arguing, and there was talk about [a] cab driver and talk about money, but not give me your money or I'm going to beat you up or where's your money, where's the money, things to that effect.

So, I just don't think that the intent to deprive the owner of the property has been established. Nothing – there's been no proof to support that the defendant took such property from the person by violence or by putting the person in fear, that he took such property intentional[ly], knowingly, or that he accomplished taking of the property with a deadly weapon.

I would submit that since there's not sufficient proof of a robbery there's certainly not sufficient proof of a felony murder, and I would respectfully request that Your Honor grant a motion of judgment of acquittal and dismiss the felony murder and dismiss the especially aggravated robbery charge.

The State responded:

I think the evidence shows that the events [concerning the offenses against the victim] happened after Ms. Scheffel left the room. We know that the defendant struck the victim at least twice. And I submit to the Court that the second striking was obviously intended to kill the victim, but it was certainly to facilitate the theft of the property. I don't think that one necessarily always proves the other, but in this case, we've established what the victim had when he came to Nashville, that he did carry his money, it was habit and custom to carry a billfold and keep his money in it. We find money, a few pieces of cash in disarray in the tub, we find his pockets turned inside out.

It's circumstantial evidence that there was a taking or an attempt to take that would qualify for felony murder, even if there was no property in fact taken. But in this case we know that his billfold was missing and at the very least that property was in fact taken at [least] by circumstantial evidence and a jury could conclude that, a reasonable person could. Consequently, we believe that the evidence is sufficient to take the case to the jury.

The trial court ruled on the motion:

Well, I think the evidence, tak[en] in the light most favorable to the State, which I have to do that now, precludes the granting of a judgment of [an] acquittal. At the very least, there is some evidence that the wallet was taken. They were arguing about money, and I think you can draw an inference from Ms. Scheffel's

-14-

testimony that a wallet was thrown away when they were driving north, I assume on the interstate. And I think that's sufficient. So, [your motion is] overruled.

Defense counsel renewed the motion for judgment of acquittal at the close of all proof and following sentencing. The trial court denied these motions.

"The standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction." State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000); State v. Ball, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998); State v. Blanton, 926 S.W.2d 953, 957-58 (Tenn. Crim. App. 1996). Because a motion for judgment of acquittal is a question of law, the trial court is permitted only to review the legal sufficiency of the evidence rather than the weight of the evidence. State v. Adams, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995) (citations omitted).

A defendant's challenge to the sufficiency of the evidence must be rejected if this court determines "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979) (emphasis in original) (citation omitted); see also State v. Scarborough, 201 S.W.3d 607, 624 (Tenn. 2006). Tennessee Rule of Appellate Procedure 13(e) states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt; therefore, a defendant on appeal has the burden of showing that the evidence is insufficient to support the jury's verdict. State v. Thacker, 164 S.W.3d 208, 221 (Tenn. 2005) (citing State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982))

This court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from that evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978), superseded by statute on other grounds as stated in State v. Barone, 852 S.W.2d 216, 218 (Tenn. 1993). A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in the State's favor. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997) (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973)). Issues regarding the credibility of witnesses, the weight and value of the evidence, and all factual issues raised by the evidence are resolved by the jury as the trier of fact, and this court does not re-weigh or re-evaluate the evidence. Id. (citing Cabbage, 571 S.W.2d at 835). Additionally, this court may not substitute its inferences drawn from the circumstantial evidence for those drawn by the jury as the trier of fact. Carruthers, 35 S.W.3d at 557 (citing Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956)).

Wiley contends that there was not overwhelming evidence that he was responsible for the victim's death. "The identity of the perpetrator is an essential element of any crime." State v. Robert

Wayne Pryor, No. M2003-02981-CCA-R3-CD, 2005 WL 901140, at *3 (Tenn. Crim. App., at Nashville, Apr. 19, 2005) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn.1975)). The State has the burden of proving "the identity of the defendant as the perpetrator beyond a reasonable doubt." Id. (citing State v. Sneed, 908 S.W.2d 408, 410 (Tenn. Crim. App. 1995)). The State may prove the perpetrator's identity using only circumstantial evidence. State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (citing State v. Reid, 91 S.W.3d 247, 277 (Tenn. 2002)). However, where the defendant is convicted based on only circumstantial evidence, the evidence must be "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." State v. Smith, 868 S.W.2d 561, 569 (Tenn. 1993) (quoting State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985)). This court has clearly identified the situations in which solely circumstantial evidence can be used to convict a defendant:

> The law is firmly established in this State that to warrant a criminal conviction upon circumstantial evidence alone, the evidence must be not only consistent with the guilt of the accused but it must also be inconsistent with his innocence and must exclude every other reasonable theory or hypothesis except that of guilt, and it must establish such a certainty of guilt of the accused as to convince the mind beyond a reasonable doubt that he is the one who committed the crime.

Pruitt v. State, 460 S.W.2d 385, 390 (Tenn. Crim. App. 1970). The jury must determine the weight given to circumstantial evidence. Williams v. State, 520 S.W.2d 371, 374 (Tenn. Crim. App. 1974). However, "[a] verdict of a jury may not be based alone upon conjecture, guess, speculation or a mere possibility." State v. Tharpe, 726 S.W.2d 896, 900 (Tenn. 1987) (quoting Sullivan v. State, 513 S.W.2d 152, 154 (Tenn. 1974)).

Felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery. . . ." T.C.A. § 39-13-202(a)(2). Especially aggravated robbery is a robbery "[a]ccomplished with a deadly weapon" and "[w]here the victim suffers serious bodily injury." Id. § 39-13-403(a). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Id. § 39-13-401(a). A deadly weapon is defined as "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Id. § 39-11-106(a)(5)(B).

In State v. Buggs, 995 S.W.2d 102 (1999), the Tennessee Supreme Court stated that there is no requirement that "[t]he felony necessarily precede the murder in order to support a felony-murder conviction." Id. at 106. The court explained that "[t]he killing may precede, coincide with, or follow the felony and still be considered as occurring 'in the perpetration of' the felony offense, so long as there is a connection in time, place, and continuity of action." Id. The Tennessee Supreme Court agreed with the prevailing view that the defendant must intend to commit the underlying felony at the time of the killing:

> Given the fact that the felony-murder rule is a legal fiction in which the intent and the malice to commit the underlying felony is "transferred" to elevate an unintentional

-16-

killing to first-degree murder, we are reluctant to extend the doctrine to include cases in which there was no intent to commit the felony at the time of the killing. Thus, in a felony-murder case, intent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the death of the victim.

Id. at 107. After considering all facts and circumstances, the jury must determine whether the defendant's intent to commit the underlying felony existed prior to or contemporaneously with the act of killing the victim. Id. at 107-08 (citing Hall v. State, 490 S.W.2d 495, 496 (Tenn. 1973); State v. Holland, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)). "[A] jury may reasonably infer from a defendant's actions immediately after a killing that the defendant had the intent to commit the felony prior to, or concurrent with, the killing." Id. at 108 (citing State v. Addison, 973 S.W.2d 260, 266 (Tenn. Crim. App. 1997), perm. app. denied (Tenn. 1998); State v. Johnson, 661 S.W.2d 854, 861 (Tenn. 1983); [State v.] Holland, 860 S.W.2d [53,] 59).

The proof at trial showed that on or about June 6, 1995, Michelle Scheffel went to the victim's room to find Wiley. When she entered the room, she saw Wiley and the victim fighting. She saw Wiley hit the victim over the head with a glass bottle, which shattered. Wiley admitted to hitting the victim over the head twice with a vodka bottle. Wiley also admitted to taking the victim's wallet and removing the money it contained and placing it in his pocket. After this incident with the victim, Wiley took Scheffel and their baby and immediately left the state. They stopped once, so Wiley could change his clothes. Scheffel remembered Wiley throwing what she thought was a wallet out of the car's window. The victim's mother stated that her son regularly carried a wallet and a money clip in his pocket.

The victim's body was found in the bathtub with his head over the toilet. The victim's pockets were turned inside out, and there was some wadded cash and blood in the bottom of the bathtub. The medical evidence showed that the victim received blunt force trauma to his head that was consistent with being hit two different times with a bottle. The DNA evidence showed that the fingerprints on the broken vodka bottle found in the victim's room belonged to Wiley.

We conclude that the evidence presented at trial was sufficient to show that Wiley had the intent to commit the especially aggravated robbery offense either prior to killing the victim or contemporaneously with killing the victim. Furthermore, the evidence supported the jury's conviction for felony-murder because the killing in this case and the underlying felony had "a connection in time, place, and continuity of action." Id. at 106. After reviewing the record, we conclude that the trial court did not err in denying Wiley's motions for judgment of acquittal. Furthermore, we conclude that the evidence was sufficient to convict him of first degree felony murder and especially aggravated robbery.

**II. Brady Violations.** Wiley argues that the State's delayed disclosure of several items of exculpatory evidence violated Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963). He contends that the cumulative effect of these delayed disclosures prejudiced his case and "cast substantial doubt on the jury's verdict." Finally, he argues that these numerous Brady violations in the aggregate

violated his right to due process. In response, the State contends that Wiley has failed to show that the delayed disclosure of the evidence prejudiced him. It further argues that the lack of prejudice is apparent because of the defense's failure to move for a continuance at the time it received the delayed disclosures.

In Brady v. Maryland, the United States Supreme Court held, "We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S. Ct. at 1196-97. Evidence that is "favorable to an accused" includes both "evidence deemed to be exculpatory in nature and evidence that could be used to impeach the state's witnesses." Johnson v. State, 38 S.W.3d 52, 55-56 (Tenn. 2001). Favorable evidence has also been defined as:

> evidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness.

Johnson, 38 S.W.3d at 56-57 (quoting Commonwealth v. Ellison, 376 Mass. 1, 379 N.E.2d 560, 571 (1978)). The State has an obligation to disclose "any favorable evidence known to the others acting on the government's behalf in the case, including police." Johnson, 38 S.W.3d at 56 (quoting Strickler v. Green, 527 U.S. 263, 275, 119 S. Ct. 1936 (1999)). Additionally, "The duty to disclose exculpatory evidence extends to all 'favorable information' irrespective of whether the evidence is admissible at trial." State v. Robinson, 146 S.W.3d 469, 512 (Tenn. 2004) (citing Johnson v. State, 38 S.W.3d 52, 56 (Tenn. 2001)).

The State does not have an obligation to disclose information that is not in the possession or control of the State. Id. (citing Banks v. State, 556 S.W.2d 88, 90). A defendant must prove the following four prerequisites in order to establish a violation of due process under Brady:

> 1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
> 2. The State must have suppressed the information;
> 3. The information must have been favorable to the accused; and
> 4. The information must have been material.

State v. Edgin, 902 S.W.2d 387, 389 (Tenn.1995). The defendant must prove a due process violation by a preponderance of the evidence. Id. (citing State v. Spurlock, 874 S.W.2d 602, 610 (Tenn. Crim. App. 1993)).

The Tennessee Supreme Court defined "material" within the context of Brady:

Evidence is deemed to be material when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." State v. Edgin, 902 S.W.2d 387, 390 (Tenn.1995); see also State v. Walker, 910 S.W.2d 381, 389 (Tenn.1995); State v. Copeland, 983 S.W.2d 703, 706 (Tenn. Crim. App.1998). . . . [A] reviewing court must determine whether the defendant has shown that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence of the verdict." Irick v. State, 973 S.W.2d 643, 657 (Tenn. Crim. App.1998) (citing Edgin, 902 S.W.2d at 390); see also Strickler, 527 U.S. at 290, 119 S. Ct. 1936. In other words, evidence is material when, because of its absence, the defendant failed to receive a fair trial, "understood as a trial resulting in a verdict worthy of confidence." Kyles, 514 U.S. at 434, 115 S. Ct. 1555.

Johnson, 38 S.W.3d at 58.

This court must analyze the State's delayed disclosure of evidence differently than the State's non-disclosure of evidence. "Generally, if there is only a delayed disclosure of information, in contrast to a complete failure to disclose exculpatory information, Brady normally does not apply, unless the delay itself causes prejudice." State v. Caughron, 855 S.W.2d 526, 548 (Tenn. 1993) (Daughtrey, J., dissenting); State v. Joan Elizabeth Hall, No. 01C01-9710-CC-00503, 1999 WL 34782, at *9 (Tenn. Crim. App., at Nashville, Jan. 28, 1999) (citations omitted). Where there is a delayed disclosure of evidence, this court must determine whether the delay kept defense counsel from effectively using this evidence in presenting and preparing the defendant's case. Caughron, 855 S.W.2d at 548 (citing United States v. Ingraldi, 793 F.2d 408, 411-12 (1st Cir. 1986)). "Delayed disclosure results in prejudice to the defendant and may deny the defendant due process when it is 'too late for the defendant to make use of any benefits of the evidence.'" State v. Sidney M. Ewing, No. 01C01-9612-CR-00531, 1998 WL 321932, at *8 (Tenn. Crim. App., at Nashville, June 19, 1998), opinion vacated and reentered by State v. Ewing, No. 01C01-9612-CR-00531, 1998 WL 485614, at *1 (Tenn. Crim. App., at Nashville, Aug. 18, 1998) (quoting Nassar v. Sissel, 792 F.2d 119, 121 (8th Cir. 1986)). An incomplete response to a Brady request might cause the defense to "abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued." United States v. Bagley, 473 U.S. 667, 682, 105 S. Ct. 3375, 3384 (1985) (citation omitted). If the defense fails to request a continuance after receipt of the evidence, fails to call or recall a witness to testify regarding the evidence, or fails to extensively cross-examine a witness regarding the evidence, the Brady violation may be cured. Sidney M. Ewing, 1998 WL 321932, at *9.

**A. Evidence of Unidentified Fingerprints.** Wiley contends that because he was not given fingerprint evidence showing that prints other than Wiley's had been collected from the scene until the first day of trial, he was unable to use this exculpatory evidence in preparing his defense. He asserts that the presence of prints other than his own bolstered the defense theory that another individual committed the offenses against the victim. Additionally, he argues that if this evidence had been provided prior to trial, then the defense could have compared the unidentified

prints to Arthur Woods, who had been in contact with the victim prior to his death and who had admitting being in the victim's room. He asserts that Hooper's failure to identify the location of items, other than the beer can and beer carton, containing fingerprints other than Wiley's was prejudicial. Further, he argues that Hooper's failure to compare these prints with those of Michelle Scheffel or the victim was prejudicial. In response, the State argues that the defense was able to cross-examine Hooper regarding the unidentified fingerprints. Further, it argues that the defense provided no proof that the presence of these fingerprints showed that someone else was responsible for the death of the victim. Finally, the State contends that the delayed disclosure was not prejudicial because Wiley's fingerprints were found on the murder weapon and because Wiley admitted at trial to hitting the victim. We agree with the State.

Here, the State had initially planned to have Danny Morris, the fingerprint analyst from Wiley's first trial, testify in the second trial. However, Morris fell ill prior to trial, which resulted in the State requesting the assistance of Morris' associate, Julia Hooper. Just before trial, Hooper analyzed the fingerprints collected in this case and compiled her own report, which was given to defense counsel the day before the State presented its proof. Defense counsel objected because she had not been able to talk to Hooper about her report and because Hooper found prints that did not match Wiley's or Scheffel's prints. Defense counsel said that she was not sure whether a continuance was necessary but asked for some time to talk to Hooper. The State responded that it had only learned the previous day that Hooper would be testifying instead of Morris and that Hooper was compiling her own fingerprint report. The State said that they did not receive a copy of Hooper's fingerprint report until around 8:30 a.m. the morning of the first day of trial and immediately provided the report to the defense. The State asserted that until they received Hooper's report that morning, they did not know that there were prints, other than Wiley's, of a quality that a match could be made. Defense counsel responded:

> If [the other prints don't] match [Wiley], that's really significant, where some of those prints may have been [located]. If it matches somebody else, that could be a suspect. You know, I don't know the right answer. I don't want to stop the trial, but it seems like that's the only alternative under the facts before me. And a little cooperation from the police department would be nice. If they would tell me, you know, now this morning, the prints that are of a quality that can be matched to some[one], where did they come from? What items did they come off of?

The trial court then stated:

> Well, we are not going to do anything now. I mean, Ms. Hooper will be over here, and I'll give you a chance to talk to her and if you want to make some offer of proof or support some motion by her testimony, you will be free, you know, you will be free to do that . . . .

The State added that the latent prints in the case had been available in the identification section since 1995. However, the State admitted that it had not looked at the latent prints until "Ms. Hooper

-20-

pulled them out and we were [previously] led to believe that Mr. Morris only found two that were matchable [sic] or identifiable and that those matched the defendant."

Julia Hooper testified that fingerprints taken from the broken vodka bottle and a beer can on the night stand belonged to Wiley. She said there were several other identifiable prints taken from Rooms 309 and 325 that did not belong to Wiley; however, she was never asked to make a comparison of these unidentified prints with known prints belonging to Scheffel or the victim. The identifiable prints were saved to the AFIS system in the computer so that future matches of these prints could be made.

We conclude that the State's delayed disclosure of the unidentified fingerprints was not prejudicial. The record shows that the State disclosed this evidence as soon as it received it from Hooper, who was asked to testify and compiled her own report immediately before trial. Defense counsel cross-examined Hooper and Marsha Brown, the officer who collected the fingerprints from the scene in this case, about the unidentified fingerprints as well as the location of these prints. At trial, Hooper testified that the prints from the vodka bottle belonged to Wiley, Wiley admitted during his testimony that he hit the victim twice with a vodka bottle, and Dr. Bucholtz testified that the victim's cause of death was blunt force trauma, with the victim's injuries consistent with at least two different blows to the head. Upon review of the record, the defense failed to show in the motion for new trial hearing that the unidentified fingerprints indicated that someone other than Wiley was responsible for the offenses against the victim. Wiley has not shown any prejudice from the delayed disclosure of this evidence. Accordingly, he is not entitled to relief on this issue.

B. **Report showing fingerprints of Michelle Scheffel on a beer bottle at the Knights Inn.** Wiley argues that he was prejudiced because he was not given the evidence of Scheffel's fingerprints on a beer bottle in the victim's room until the first day of trial. He contends that this evidence had significant impeachment value because Scheffel neither testified nor included in her prior statements to police that she had been in the victim's motel room at another time or that she had consumed any alcohol in that room. He further contends that the State's failure to disclose the precise location of the bottle containing Scheffel's prints in the victim's room was prejudicial. In response, the State argues that the delayed disclosure of this evidence was not prejudicial because Scheffel admitted that she was present in the victim's room on the day of his death and because defense counsel extensively cross-examined Scheffel regarding her version of the events that day. We agree with the State.

In this case, defense counsel was given a report dated December 24, 1996, which stated that Scheffel's fingerprints had been found on a beer bottle from a night stand at the Knights Inn, although it did not identify the specific room from which it was taken. Defense counsel noted that she received this report only a few minutes before Julia Hooper's testimony and did not have an opportunity to fully investigate the report for trial. The trial court stated, "[U]nless I'm missing something, and I may be, but it's . . . shouldn't be a surprise to anybody that Michelle Scheffel was in that room, is it?" Defense counsel responded that she did not know whether Scheffel's prints on

the beer bottle came from the Scheffel's and Wiley's room or the victim's room at the Knights Inn.

At the motion for a new trial hearing, defense counsel explained:

> With respect to, though, argument No. 5, there is a bolded addition that I put in the first motion for new trial stating that the prints of Michelle [Scheffel] were located on the bottle and were positively identified as hers. We found this out on the morning of trial. We were deprived the opportunity to determine [the location of the bottle] that Ms. [Scheffel's] prints were seized from and we were deprived [of] the opportunity to incorporate this evidence into the defense.

> [T]hat bottle that contained Ms. [Scheffel's] prints would have to have been found in [the victim's] motel room. If I recall the proof correctly, Ms. [Scheffel] said she was in there for a matter of minutes, was in and then was out. She never talked about picking anything up, touching beer bottles or drinking beer or anything like that. Her print existing in that hotel room or motel room calls into question what she really was doing in there, what was happening.

> I was deprived of the opportunity of being able to cross examine her or incorporate that into our theory of the case. It would have been impeachment as far as I'm concerned. Having that thrown on me in the middle of the trial when all sorts of other things were being thrown at the same time put Mr. Wiley at a disadvantage.

The trial judge stated that he believed Ms. Scheffel had admitted at trial that she had been in the victim's room, to which defense counsel responded:

> Yes, [Scheffel] did, but she didn't testify that she was picking up beer bottles or touching things. I don't know if that indicates, perhaps, she may have come in later at another time after the fact. I just don't know. Part of our argument, as The Court recalls, is that there was a possibility that someone came in later. I think that . . . bottle may have opened the door to exploiting that theory of the defense more, and that was taken from us by the State's failure to disclose despite their obligation under Brady and the other rules of discovery to do so.

We conclude that the delayed disclosure of the report showing Scheffel's fingerprints on a beer bottle at the Knights Inn was not prejudicial. We note initially that the record is devoid of any evidence that the beer bottle containing Scheffel's prints was found in the victim's room, rather than in Scheffel's and Wiley's room. Although defense counsel intimated at the motion for new trial hearing that the beer bottle had to have been taken from the victim's room, the defense presented no evidence at trial or at that hearing to support this argument. Further, even if the bottle containing Scheffel's prints had been collected from the victim's room, Scheffel admitted to entering the victim's room the day of his death. The record shows that the defense extensively cross-examined Scheffel regarding her version of the events the day of the victim's murder. However, the record

shows that defense counsel failed to cross-examine Julia Hooper and failed to recall Marsha Brown regarding the location of the bottle containing Scheffel's prints. Upon our review of the record, the State's delayed disclosure of this evidence was not prejudicial. Accordingly, Wiley is not entitled to relief on this issue.

**C. Interview of Michelle Scheffel by Detective Phillip George.** Wiley argues that the State's delayed disclosure of Michelle Scheffel's interview by Evansville Detective Phillip George violated Brady. Wiley contends that this delayed disclosure was prejudicial because the statement could have been used to impeach Scheffel, since her statement during this interview was inconsistent with other statements given by Scheffel to law enforcement and because it prevented defense counsel from fully preparing for trial. He also argues that the trial court failed to make a ruling regarding defense counsel's objection to the admission of this evidence. In response, the State argues that the delayed disclosure of Scheffel's statement was not prejudicial because Scheffel admitted to making the statement to Detective George and because she explained the inconsistencies between her different statements at trial. We agree.

Here, the record clearly shows that the defense had requested any statements, notes, and reports related to the interviews of Michelle Scheffel before trial. During trial, defense counsel was given a report written by Phillip George, stating that he had interviewed Scheffel and obtained a statement after she was taken by police from the Arrowhead Motel. The defense argued that Scheffel's statement taken by George was inconsistent with her other statements because she claimed that she did not know the victim and did not know anything about the victim's murder. Defense counsel moved to prevent Scheffel from testifying at all at Wiley's trial. In response, the State asserted that it believed that Scheffel was going to admit that she made the statement that she gave to Detective George. The State then argued that the defense had notice of this statement because it had already been provided as Jencks material. At that point, defense counsel moved for a mistrial and moved to prevent Scheffel from testifying. The trial court ruled:

> We'll there's no occasion for a mistrial . . . . I think if you look at Brady and its progeny and there's one of those cases that went to the US Supreme Court where impeachment evidence is [required to be disclosed under] Brady. You've got an important State's witness who has made inconsistent statements in this Judge's view and I think in most judge's view that would be considered Brady material, so that goes beyond Jencks matter, and it would [have been] Brady material and it should have been provided.

The State admitted that this information should have been provided to the defense and had no explanation for why it was not provided. Then the trial court and defense counsel discussed the issue:

> THE COURT:      [Y]ou heard me say it was Brady material, that should have been produced because of a prior inconsistent statement of a major State's witness, but, you know, if things unfold and

-23-

she admits that she said that, then there really is no prejudice that flows from it. If she says she didn't say [the statement to Detective George] and you're now precluded from calling this Detective George . . . to impeach, then there's a problem.

DEFENSE COUNSEL:        And for the record, I mean, I guess what I wanted to be abundantly clear for the record, one, Your Honor is finding a Brady violation, correct?

THE COURT:        Well, you heard what I said.

DEFENSE COUNSEL:        And also then again, I've got the transcript from the hearing on August [24], where the same issue with this same Detective George came up on page 32, where it was I've never . . . received [a] report from Detective George, I specifically asked for a report from these people, I think it's material to the preparation for the defense . . . . And while I was speaking in the context of the suppression hearing, these issues have been going on for months in this case.

And I just think it undercuts sort of the trustworthiness of the trial that Mr. Wiley's getting at this point. I mean, I don't know what else is out there. I just know we're stumbling upon [things] as we go through this process, and you know – I understand the Court's ruling. I just don't agree with it.

We conclude that the delayed disclosure of the interview of Scheffel by Detective George was not prejudicial. At trial, Scheffel acknowledged that the statement that she gave to Detective George was inconsistent with the second statement she gave to Detective West and explained the inconsistencies. Defense counsel received Scheffel's statement to Detective George prior to Scheffel's testimony, and defense counsel was able to extensively cross-examine Scheffel regarding the inconsistencies between this statement and her other statements to law enforcement. Further, we note that the defense could have impeached Scheffel with her first statement to Detective West, which was similar in substance to the statement she gave to Detective George. Accordingly, Wiley is not entitle to relief on this issue.

**D. Videotaped statement of Wiley and his mother and Wiley and Scheffel.**
Wiley argues that despite the fact that he requested all of his videotaped statements in his Motion to Compel Discovery, the State did not notify him until the third day of trial of the damaged videotape from Evansville containing statements of Wiley and his mother and Wiley and Scheffel. He claims the State's failure to disclose the damaged tape prior to trial prejudiced him because he was unable to subpoena Detective George, who was responsible for videotaping these statements.

-24-

He also argues that the State's delayed disclosure of the videotape was prejudicial because it could have been used to impeach Detective Flair, who claimed that the videotape was destroyed. Finally, he contends that a timely disclosure of the videotape would have ensured that the defense could have attempted a recovery of the videotape prior to trial, which could have yielded helpful information to the defense. In response, the State argues that Wiley failed to prove that anything on the damaged videotape or observed by Detective George would have affected his ability to defend this case. We agree.

During trial, the State asserted that these videotaped statements had been destroyed by faulty equipment. At the jury out hearing, Detective Larry Flair testified that the Evansville Police Department videotaped an interview with Wiley while Scheffel and Wiley's mother were present in the room. However, he said that the machine used to videotape this interview malfunctioned and the tape was "practically destroyed." Detective Flair stated that several months later, the District Attorney for Davidson County was made aware of the damaged videotape, and she requested it. He said that he believed the Evansville Police Department mailed the damaged videotape to the District Attorney's office in Nashville.

Defense counsel acknowledged that she received the damaged videotape during Wiley's trial. Then the trial court and defense counsel had the following discussion:

| THE COURT: | I suspect there's a way to figure out whether [the damaged videotape] is recaptureable [sic] or not. |
|---|---|
| DEFENSE COUNSEL: | I don't know, I'm not a technician. But it's just troubling to me that I made even specific requests Monday morning at 9 o'clock on things that we have come to find did exist and we are getting them on Wednesday of the trial despite my requests, despite things put in writing. And I think what that does is undercut the trustworthiness there is in this process and in this trial. So, I would just want that put on the record. . . . |
| | And I would respectfully request that Your Honor, you know, at this point I think the only fair thing to do is dismiss the indictment, quite frankly. We've got a destroyed tape I didn't know about, we have . . . lost tapes from before, we have a lost towel. It just seems like at some point the sanctity of the process has been compromised. And I think in this case, it has now risen to that level and that the appropriate thing to do would be either to dismiss the indictment or again declare a mistrial. |

THE COURT: Well, there is no occasion here to dismiss this indictment or to declare a mistrial as a sanction for these, I guess, violations of Rule 16 or the like. I mean, the Judge has not been shown anything that is prejudicial to a fair trial. . . . [A]s disturbing as some of this [is], I mean, the State has not dotted the "I" and crossed the "T" every [time] it should have. The Judge, I cannot find anything that has interfered with the ability of the defense to do a good job in this case. So the answer is no.

During the hearing on the motion for a new trial, defense counsel made an exhibit of the videotape that Detective Flair stated at trial was damaged. She explained that she was not able to investigate the viability of the videotape because she did not receive it from the State until the middle of Wiley's trial. When the trial court asked defense counsel if she was able to find anything helpful to the defense in the non-damaged portion of the tape, defense counsel responded:

[The videotape] has surveillance of Mr. Wiley talking to his mother for a while. It's kind of jumping around. I tried to find someone to enhance the tape or fix the tape, and I couldn't find a company that does that. Then there is [a] conversation between Mr. Wiley and Ms. [Scheffel] that is recorded also. Again, I couldn't retrieve it, but it's on there showing them sitting together.

[The videotape] may have been helpful, actually, in cross-examining Detective [Flair] and Detective West and some of the officers from Indiana who claimed this tape was destroyed because it, in fact, was not entirely destroyed. I think it could have been impeachment material that had I had it in advance of trial, I may have been able to use that effectively somewhat, but having this sprung on me on the second or third day of trial certainly put me at a disadvantage for being able to incorporate that.

Also the fact of this evidence that is potentially destroyed kind of brings to mind also the possibility of another Ferguson motion and calls into question what else might have been destroyed or otherwise not properly preserved, that sort of thing in this case. So I would ask that it be made an exhibit, and the [Tennessee] [C]ourt of [C]riminal [A]ppeals or the [S]upreme [C]ourt, whoever reviews this case again, they can make a determination with respect to whether or not it was prejudicial.

We initially note that defense counsel was unable to repair the videotape in the approximately eleven weeks between Wiley's trial and the motion for a new trial hearing. At the motion for a new trial hearing, defense counsel stated the tape was in such a condition that she could see Wiley talking to his mother and Wiley talking to Scheffel, but she could not recover any audio from the videotape. At this hearing, defense counsel was unable to specifically pinpoint anything prejudicial about the State's delayed disclosure except to claim that if she had been given the videotape prior to trial, she could have used it to impeach Detective Flair and Detective West since they claimed the tape was

destroyed. The defense could have called Detective Flair in its case-in-chief and attempted to impeach him regarding the extent of the damage to the videotape at trial, but it failed to do so. In addition, the defense could have called Detectives West and Flair to testify during the motion for a new trial hearing regarding the contents of the videotape; however, the record does not indicate that this was done. Although defense counsel was unable to fix the videotape by the motion for a new trial hearing, the record does not indicate that the defense's inability to repair the tape was caused by the delayed disclosure. Upon review of the record, we conclude that Wiley has failed to present any evidence showing the delayed disclosure was prejudicial. Accordingly, Wiley is not entitled to relief on this issue.

**E. Supplemental Reports by Detective Larry Flair and Evidence Obtained by Detective Flair.** Wiley contends that he was prejudiced by the State's failure to disclose several reports and supplemental reports prepared by Detective Flair. He also argues that the State failed to disclose the fact that Detective Flair collected several pairs of shoes from the motel room in Evansville, including the pair of shoes that Wiley said he wore at the time he hit the victim with the glass bottle. Because of these delayed disclosures, the defense was unaware of the shoes that were seized, and therefore, was unable to have them independently tested. In addition, the defense was unable to consider this evidence prior to the cross-examination of Detective Flair. In response, the State argues that Wiley has failed to show how the delayed disclosure of the reports and seized evidence specifically affected defense counsel's performance or was material to the defense. Wiley details the defense's efforts to obtain this information prior to trial in his brief to this court:

> On August 14, 2006, nearly six months prior to trial, counsel for [Wiley] filed a Third Motion to Compel Discovery, specifically requesting any and all reports of Detective Larry Flair. . . . Also, on the first day of trial, as defense counsel was discovering items of evidence that were never provided to her, she specifically requested from the State an evidence log prepared by Detective Flair of items seized from the motel room in Indiana where police found [Wiley]. . . . Defense counsel had also filed prior to trial a Fourth Motion to Compel, specifically requesting any and all property logs or receipts generated by Detective Flair. . . . The prosecutor declared that he had provided everything in the State's file to defense counsel and that he was not aware of any property log created by Detective Flair. . . . On the third day of trial, the prosecutor admitted to the trial court and defense counsel that he had not provided defense counsel with those reports. . . .

At trial, during a hearing outside the presence of the jury, Detective Larry Flair stated that he had given several reports to the State in preparation for this case. Defense counsel then stated that she had never received these reports:

> [J]ust for the record, I've never seen this report, ever. Never. I believe I asked on Monday for evidence logs and such about what Detective Flair had seized from the motel room in Evansville, Indiana, and here they are right in front of me stating what he took from the hotel room there. And here's an evidence log that also refers to some things that I had to go back into the property room and look for to find

out, you know, the sizes of things which takes me a couple of hours [be]cause you have to make people get up there and dig through everything to double check stuff . . . .

And I think at this point it's fair to put it on the record, I am court-appointed counsel. I am a solo practitioner. I have put over 250 hours into this case spinning my wheels finding stuff that should be in these reports. I feel like it's some sort of tactical thing to make me burn my time and side track me.

The State responded by claiming it thought Detective Flair's reports had been provided to the defense. The trial court then stated, "Well, it's Wednesday afternoon and apology number one I accept, but we are on about apology number four. This is not a way to conduct a serious felony trial." The trial court asked defense counsel if there was anything important in the documents that she had just received from the State. Defense counsel responded that she did not "today, during this break . . . see something that's in [these documents] that is a smoking gun." Defense counsel moved for a dismissal of the indictment or a mistrial because of damaged videotape of Wiley's interview and because of Detective Flair's reports which were not disclosed by the State. The trial court refused to grant these motions because it found that none of the violations were prejudicial to Wiley receiving a fair trial.

We conclude that the delayed disclosure of Detective Flair's reports and the evidence collected by him was not prejudicial. Regarding the delayed disclosure of Detective Flair's reports, defense counsel admitted at trial that she had found the things listed in his reports in the property room. She also acknowledged during trial that she did not see anything in Detective Flair's reports that was a "smoking gun." Although the defense had the option of recalling Detective Flair during its proof to fully question him regarding the contents of his reports, it failed to do so. Regarding the delayed disclosure of Wiley's shoes collected by Detective Flair at the Arrowhead Motel in Indiana, the defense conducted an extensive cross-examination of Detective Flair regarding two different pairs of size eleven shoes he collected from Wiley's motel room in Indiana. Wiley has failed to show specifically how he was prejudiced by the delayed disclosure of this evidence. Accordingly, he is not entitled to relief on this issue.

F. **Cumulative Errors.** Wiley claims that the State's delayed disclosure of the above evidence had the cumulative effect of compromising his second trial. Because this evidence was not disclosed until trial, he claims it disrupted the preparation and presentation of his defense, it required defense counsel to determine whether evidence was exculpatory at the point that it was disclosed during trial, and it prevented defense counsel from presenting "all of the evidence favorable to [him] to the jury in an organized and understandable fashion." In response, the State contends that because Wiley was unable to prove individual errors, he is unable to prove that cumulative errors negatively affected his trial.

Here, defense counsel summarized the cumulative effect of the State's refusal to disclose several items of evidence:

With all due respect to Your Honor about the ability of the defense to do its job in this case, what this has done to the defense is force the defense to call sidebars in front of the jury repeatedly, which I don't like to do quite frankly. I know [the jury] want[s] to sit there, I know they want to hear what's going on, and I feel like it really has disrupted the process, what I've been forced to the stop, go up there, make a record, and you know what, it's just plain upsetting to me, too.

And I think that at some level it almost seems like a tactic to throw the defense off, especially when several of these items were asked for Monday morning. So, I think that about some point the fairness, it's not just about the prejudice to whether or not Mr. Wiley is going to be found guilty, there's prejudice to him, and then it affects my performance, it makes me upset, it makes me outraged, quite frankly.

During the hearing on the motion for a new trial, defense counsel stated that she specifically included the cumulative effect of the <u>Brady</u> violations and discovery violations in her motion for a new trial because she was unsure that she clearly raised these issues at trial. The State responded:

I just want to say that the reference to violations of <u>Brady</u> simply should be taken, I believe, as a shorthand way of saying that had this information been suppressed and had it not been provided to counsel during the trial, that it would have been a <u>Brady</u> violation as opposed to the fact that the evidence and information in some cases not provided prior to trial, it was certainly provided during the trial and made available for their use during the trial. I am not arguing whether or not any lawyer would have rather had it as far in advance as possible, but the information was presented to the jury.

At the conclusion of the hearing, the trial court concluded that the delayed disclosures were not prejudicial to the defense.

We have already determined that Wiley is not entitled to relief on any of the alleged <u>Brady</u> violations, and we conclude that there is no cumulative error that compromised his second trial. However, we are extremely concerned about the State's failure to timely disclose the aforementioned exculpatory information. Although the delayed disclosures did not prejudice the defendant in this particular case, we strongly caution the State that a pattern of providing delayed disclosures of exculpatory evidence certainly could prejudice defendants in other cases.

**III. New Trial Because of Discovery Violations.** Wiley contends that he should be granted a new trial because of the State's numerous discovery violations. He asserts that these violations, especially when taken together, "constitute reversible error" because "they severely hindered defense counsel's ability to prepare for and effectively present [his] defense." He additionally argues that the trial court erred in denying his request for a mistrial and the numerous discovery violations violated his right to due process. He details his defense counsel's numerous attempts to obtain this evidence:

Pursuant to Rule 16 of the Tennessee Rules of Criminal Procedure, [defense counsel] filed a Request for Discovery and/or Inspection with the trial court on March 6, 2006. Counsel for [Wiley] also filed a Notice of Receipt of Discovery with the trial court acknowledging receipt of all items received by the State in response to her request for discovery. Despite her initial request, and despite four separate Motions to Compel Discovery, in which she made specific requests for evidence possessed by the State, as stated in the foregoing issue on appeal, defense counsel was surprised with specifically requested items of evidence on several occasions during the course of [Wiley's] trial.

In response, the State argues that Wiley failed to show how the discovery violations prevented him from presenting an adequate defense and that the trial court did not err in failing to grant a mistrial. The State further contends that the defense's failure to request a continuance emphasizes that the discovery violations were not prejudicial.

The pertinent sections of Tennessee Criminal Procedure Rule 16 are as follows:

(a) Disclosure of Evidence by the State.
(1) Information Subject to Disclosure.
(A) Defendant's Oral Statement. Upon a defendant's request, the state shall disclose to the defendant the substance of any of the defendant's oral statements made before or after arrest in response to interrogation by any person the defendant knew was a law-enforcement officer if the state intends to offer the statement in evidence at the trial;
(B) Defendant's Written or Recorded Statement. Upon a defendant's request, the state shall disclose to the defendant, and make available for inspection, copying, or photographing, all of the following:
(i) the defendant's relevant written or recorded statements, or copies thereof, if:
(I) the statement is within the state's possession, custody, or control; and
(II) the district attorney general knows--or through due diligence could know--that the statement exists; and
(ii) the defendant's recorded grand jury testimony which relates to the offense charged.
          . . . .
(F) Documents and Objects. Upon a defendant's request, the state shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings, or places, or copies or portions thereof, if the item is within the state's possession, custody, or control and:
(i) the item is material to preparing the defense;
(ii) the government intends to use the item in its case-in-chief at trial; or
(iii) the item was obtained from or belongs to the defendant.
(G) Reports of Examinations and Tests. Upon a defendant's request, the state shall permit the defendant to inspect and copy or photograph the results or reports of physical or mental examinations, and of scientific tests or experiments if:
(i) the item is within the state's possession, custody, or control;

-30-

(ii) the district attorney general knows--or through due diligence could know--that the item exists; and

(iii) the item is material to preparing the defense or the state intends to use the item in its case-in-chief at trial.

(2) Information Not Subject to Disclosure. Except as provided in paragraphs (A), (B), (E), and (G) of subdivision (a)(1), this rule does not authorize the discovery or inspection of reports, memoranda, or other internal state documents made by the district attorney general or other state agents or law enforcement officers in connection with investigating or prosecuting the case. Nor does this rule authorize discovery of statements made by state witnesses or prospective state witnesses.

Tenn. R. Crim. P. 16(a).

Rule 16 also states that in the event that a party fails to comply with a discovery request, the trial court may "order that party to permit the discovery or inspection," "grant a continuance," "prohibit the party from introducing the undisclosed evidence," or "enter such other order as it deems just under the circumstances." Tenn. R. Crim. P. 16(d)(2)(D). Where a party fails to produce discoverable material by the deadline, "the trial judge has the discretion to fashion an appropriate remedy; whether the defendant has been prejudiced by the failure to disclose is always a significant factor." State v. Smith, 926 S.W.2d 267, 270 (Tenn. Crim. App. 1995) (citing State v. Baker, 751 S.W.2d 154, 160 (Tenn. Crim. App. 1987)). Furthermore, "the burden rests on the defense to show the degree to which the impediments to discovery hindered trial preparation and defense at trial." State v. Brown, 836 S.W.2d 530, 548 (Tenn. 1992). "Generally speaking, the exclusion of the evidence is a drastic remedy and should not be implemented unless there is no other reasonable alternative." State v. Smith, 926 S.W.2d 267, 270 (Tenn. Crim. App. 1995).

Wiley asserts that the discovery violations should have resulted in a mistrial. The grant or denial of a motion for a mistrial rests within the sound discretion of the trial court. State v. Robinson, 146 S.W.3d 469, 494 (Tenn. 2004). A trial court should declare a mistrial "only upon a showing of manifest necessity." Id. (citing State v. Saylor, 117 S.W.3d 239, 250-51 (Tenn. 2003)). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." State v. Reid, 164 S.W.3d 286, 341-42 (Tenn. 2005) (citing State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996)). This court will not reverse the trial court's denial of a motion for mistrial "absent a clear showing that the trial court abused its discretion." Robinson, 146 S.W.3d 469, 494 (citing State v. Reid, 91 S.W.3d 247, 279 (Tenn. 2002)). The party seeking a mistrial has "the burden of establishing the necessity of a mistrial." Reid, 164 S.W.3d at 342 (citing Williams, 929 S.W.2d at 388).

**A. Fingerprint Evidence.** Wiley contends that the State's failure to disclose that fingerprint analyst Julia Hooper was going to be testifying instead of the initial examiner and that Hooper had made additional fingerprint comparisons was prejudicial. First, he claims the delayed disclosure of this information was prejudicial because defense counsel was unable to meet with Hooper to discuss her findings. Second, he claims the delayed disclosure of this information was prejudicial because defense counsel was unable to present the evidence that fingerprints other than Wiley's were found at the scene of the crime. In response, the State contends that the delayed

-31-

disclosures did not violate Rule 16 because Hooper's report was immediately supplied to the defense. In addition, the State argues that even if the delayed disclosure of this evidence violated Rule 16, Wiley has failed to show how the delay was prejudicial since he offered no proof that another individual was responsible for the victim's death and since he admitted to hitting the victim on the head twice with the murder weapon. We agree.

We conclude that the State's delayed disclosure under Rule 16 of the unidentified fingerprints was not prejudicial. The record shows that the State disclosed this evidence as soon as it received it from Hooper, who was asked to testify and compiled her own report immediately before trial. Defense counsel cross-examined Hooper and Officer Marsha Brown about the unidentified fingerprints as well as the location of these prints. At trial, Wiley admitted that he hit the victim twice with a vodka bottle. Dr. Bucholtz testified that the victim's cause of death was blunt force trauma, with the victim's injuries consistent with at least two different blows to the head. Upon review of the record, the defense failed to prove that the unidentified fingerprints showed that someone other than Wiley was responsible for the offenses against the victim. Wiley has failed to show the degree that the delayed disclosure of this evidence hindered his trial preparation and defense. See Brown, 836 S.W.2d at 548. Accordingly, he is not entitled to relief on this issue.

**B. Officer Marsha Brown's Evidence Log.** Wiley argues that the State's delayed disclosure under Rule 16 of Officer Marsha Brown's report regarding the latent fingerprints taken from the victim's room was prejudicial. He additionally argues that Officer Brown's refusal to meet with defense counsel was also prejudicial. In response, the State argues that the defense failed to specifically show any prejudice and failed to make any additional objections to the late disclosure of the evidence log. We agree.

During Officer Brown's testimony, defense counsel notified the trial court that she never received one of Brown's reports detailing her activities collecting and documenting evidence in the victim's room:

[Defense Counsel]:    I've never seen that before. That was her report –

[The State]:    This right here? Have you seen this?

[Defense Counsel]:    I have not seen this. I've seen that.

[The State]:    Okay. That?

[Defense Counsel]:    No. And I – for the record, again, there's another one.

The Court:    Well, that would be a Jencks statement, wouldn't it?

[Defense Counsel]:    Well, I just asked for Jencks on the record, Your Honor –

The Court:    Okay.

| [Defense Counsel]: | – and I didn't get it.  I had to ask her questions. |
|---|---|
| The Court: | Okay. |
| [Defense Counsel]: | Just for the record, I would note again, there's another report that I have not been provided, even when I asked for the report.  And I also filed a motion for Jencks, I did not get the report. |
| The Court: | Okay.  Well, you've got it now. |

Defense counsel did not make any further objections regarding this report.  Later, Officer Brown acknowledged during her testimony that she refused to meet with defense counsel regarding Wiley's case.

Although it is clear that this evidence should have been disclosed under Rule 16, we conclude that the State's delayed disclosure of Brown's evidence log was not prejudicial.  Wiley failed to show the degree that the delayed disclosure of this evidence hindered his defense.  See Brown, 836 S.W.2d at 548.  Furthermore, the defense offered no specific arguments at trial or at the motion for new trial hearing regarding how the delayed disclosure of this information was prejudicial.  Accordingly, he is not entitled to relief on this issue.

**C. Receipt from Arrowhead Motel.**  Wiley contends for the first time on appeal that the State's failure to disclose the receipt from the Arrowhead Motel showing that he and Scheffel checked into the motel on June 23, 1995, was prejudicial because the State used this receipt to show Wiley's flight from the state of Tennessee.  He also claims it was prejudicial because defense counsel was unable to prepare for the admission of this receipt.  In response, the State argues that defense counsel's comments that the document was not a surprise and was not necessary to the State's case support its contention that the delayed disclosure of this evidence was not prejudicial.  We agree with the State.

During Detective Flair's testimony, defense counsel objected to the admission of the Arrowhead Motel receipt on the ground that it had not been disclosed during discovery.  Defense counsel then requested that all testimony by Detective Flair be stricken and that Wiley be granted a mistrial.  The State responded that the receipt was included in the case file that defense counsel had access to since 2002.  Defense counsel acknowledged that the receipt did not come as a surprise, given the facts of this case, but asserted that she had never seen the receipt prior to its admission.  Defense counsel also argued that the receipt was not necessary to prove the State's case.  The trial court determined that the document should have been provided during discovery; however, the court refused to grant a mistrial because the receipt did not prejudice Wiley.

We acknowledge that this receipt should have been disclosed during discovery.  However, we conclude that the State's delayed disclosure of the Arrowhead Motel receipt was not prejudicial.  During trial, defense counsel admitted that the receipt was not a surprise and was not necessary to prove the State's case.  The jury had already heard testimony from Detective James Walker and Larry

Flair, who stated that Wiley had been arrested at the Arrowhead Motel in Evansville, Indiana. Wiley failed to show the degree that the delayed disclosure of this evidence hindered his trial preparation and defense. See Brown, 836 S.W.2d at 548. Accordingly, he is not entitled to relief on this issue.

**D. Detective Larry Flair's Reports, Supplemental Reports, and Property Log.** Wiley asserts that the State failed to disclose Detective Flair's reports, supplemental reports, and property log under Rule 16. However, he fails to include any argument on this issue. In response, the State argues that defense counsel's acknowledgment that she did not see a "smoking gun" in these documents shows that the documents were not prejudicial. Further, the State contends that these items were not discoverable since the State did not utilize the documents in its case-in-chief and since Wiley has not shown that they were essential to his defense. Although the State notes that Wiley provided no argument on this issue, the State fails to specifically assert that Wiley has waived this issue.

We note that Wiley has waived this issue because of his failure to provide an argument. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); Tenn. R. App. P. 27(a)(7) (A brief shall contain "[a]n argument . . . setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on."). Notwithstanding waiver, and as we stated in the previous issue, we conclude that the delayed disclosure of Detective Flair's reports was not prejudicial. Defense counsel admitted at trial that she had found the things listed in his reports in the property room and acknowledged during trial that she did not see anything in Detective Flair's reports that was a "smoking gun." Although the defense had the option of recalling Detective Flair during its proof to fully question him regarding the contents of his reports, it failed to do so. Upon review, Wiley failed to show the degree that the delayed disclosure of this evidence hindered his defense. See Brown, 836 S.W.2d at 548. Accordingly, he is not entitled to relief on this issue.

**E. Interview of Michelle Scheffel by Detective George.** Wiley contends that he is entitled to relief because of the State's failure to disclose under Rule 16 Scheffel's statement to Detective George in Evansville, Indiana. In response, the State argues that this evidence was not prejudicial since defense counsel was able to cross-examine Scheffel regarding this statement and since Scheffel admitted that she made the statement and explained why it was inconsistent with her other statements to law enforcement.

In our previous discussion, we held that the admission of Scheffel's statement did not violate Brady. Here, Wiley challenges Scheffel's statement as a delayed disclosure under Rule 16. However, Rule 16 prohibits the disclosure of statements made by state witnesses or prospective state witnesses. Tenn. R. Crim. P. 16 (a)(2). Accordingly, Wiley is not entitled to relief on this issue.

**F. Miscellaneous Violations.** Wiley asserts that the State failed to disclose under Rule 16 Officer Tommy Simpkin's reports regarding evidence collected from the crime scene. In addition, he contends that the State failed to disclose that Detective Walker was going to testify that Wiley was arrested in Evansville and transported to Nashville. Wiley includes no argument

-34-

regarding either of these issues. In response, the State argues that Wiley has waived the issues for failure to support them with argument. See Tenn. R. Crim. App. 10(b). In addition, the State contends that Detective Walker's testimony was not discoverable because it was not documentary, was not analysis, and did not involve the statement of the defendant. Finally, the State argues that Wiley has not specifically shown how the late disclosure of Simpkin's reports and Detective Walker's testimony negatively affected his case.

During Officer Simpkin's testimony, defense counsel stated that she had not received several of Officer's Simpkin's reports to which he referred to while testifying:

> We have another what I would submit is a Rule 16 violation. I'm finding property sheets and items I've never seen. I'm finding reports of blood samples that were taken, chain of custody documents that I'm entitled to in discovery. It's a systematic – things I'm not getting. I filed a notice of receipt in discovery with this Court early on in this case, saying here's everything I have.
>
> I'm asking – you know, getting into trial, here again, we have another discovery violation. So, I think I have to put that on the record. I'm going to need to make copies of these. I don't know the extent of, you know, the significance of them. But they are chain of custody-type documents, the blood sample collection, it refers to who took the photos of room 325, which I never knew until the day before yesterday, when I asked to look at the back of the photographs. It's the same problem. This is all stuff I should have had in advance. Half of the things I have, half of them I don't, you know. I've never seen the laboratory examination things like that, ever.

Defense counsel also objected to the State's failure to give her notice that it was going to call Detective Walker to testify. Detective Walker of the Evansville Police Department testified that on June 25, 1995, he was notified that Wiley had been arrested at the Arrowhead Motel in Evansville, Indiana. He stated that his department notified the Metropolitan Nashville Police Department that Wiley was in their custody, and Wiley was later taken back to Nashville.

We agree with the State that Wiley waived these issues because of his failure to provide any argument. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); Tenn. R. App. P. 27(a)(7) (A brief shall contain "[a]n argument . . . setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on."). Notwithstanding waiver, we acknowledge that Officer Simpkin's reports should have been disclosed during discovery; however, we conclude that the State's delayed disclosure of the reports under Rule 16 was not prejudicial. Wiley failed to show the degree that the delayed disclosure of the reports hindered his trial preparation and defense. See Brown, 836 S.W.2d at 548. Because Detective Walker's testimony did not contain any statements made by the Wiley, it was not discoverable under Rule 16. Accordingly, he is not entitled to relief on this issue.

**G. Cumulative Error.** Wiley contends that the cumulative effect of these Rule 16 violations is reversible error because it prevented defense counsel from preparing and presenting Wiley's defense. He also argues that the State's failure to disclose this evidence in discovery violated his due process rights and undermined confidence in his trial's outcome. In response, the State argues that Wiley failed to show that the alleged Rule 16 violations viewed individually or cumulatively, were prejudicial and, therefore, argues that he is not entitled to relief. We find the number of discovery violations disconcerting. However, we have already determined that Wiley is not entitled to relief on any of the aforementioned discovery violations, and we conclude that there is no cumulative error that negatively affected his trial.

**IV. Admissibility of Evidence.** Wiley argues that the trial court erred in admitting into evidence his Knights Inn employment application and Arrowhead Motel receipt. He also contends that neither the employment application nor the receipt was properly authenticated.

In response, the State generally argues that Wiley has failed to show that the trial court abused its discretion in admitting this evidence and has failed to show that the employment application and receipt were not properly authenticated. It additionally argues that even if the trial court erred in admitting the employment application and the receipt, then this error was harmless beyond a reasonable doubt. Regarding the Arrowhead Motel receipt, the State contends that Wiley waived this issue because the defense failed to renew its objection on hearsay grounds after the court ruled that there was no prejudice stemming from the Rule 16 violation. See Tenn. R. App. P. 36(a). The State also contends that the motel receipt was not offered to prove the truth of the matter asserted.

According to Rule 801(c), hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Rule 802 states that "hearsay is not admissible except as provided by these rules or otherwise by law." Tenn. R. Evid. 802. Recently, there has been disagreement as to whether the standard of review regarding the admissibility of hearsay is an abuse of discretion standard or a de novo without a presumption of correctness standard. In Pylant v. State, the Tennessee Supreme Court noted Judge Witt's dissent in the Pylant case at the Tennessee Court of Criminal Appeals level, wherein he concluded that the admissibility of hearsay statements is a question of law and is reviewed de novo without a presumption of correctness, rather than under the abuse of discretion standard of review. 263 S.W.3d 854, 871 (Tenn. 2008) (citing State v. Dennis Pylant, 2007 WL 1890178, at *12 (Tenn. Crim. App., at Nashville, June 29, 2007) (Witt, J., dissenting) (citations omitted), rev'd, 263 S.W.3d 854 (Tenn. 2008). In Pylant, the Tennessee Supreme Court also noted Judge Witt's opinion in State v. David Kyle Gilley regarding hearsay:

> A trial court's first duty is to determine whether the out-of-court declarant's statement is hearsay–that is, whether it is "offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). No factual issue attends this determination, and it necessarily is a question of law. See Schiefelbein, 230 S.W.3d at 128; [Keisling v. Keisling, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005)]. If the statement is offered to prove the truth of the matter asserted and no exceptions apply, see Tenn. R. Evid. 803, 804, the statement is, purely and simply, inadmissible. Tenn.

R. Evid. 802. At this juncture, the court has no discretion to hold otherwise, and to utilize an abuse of discretion standard at this point in the analysis "'would have us defer to a discretion that the trial court does not possess.'" See State v. Edison, 9 S.W.3d 75, 78 (Tenn.1999) (quoting Tipton, J.).

Pylant, 263 S.W.3d at 871 (citing State v. David Kyle Gilley, No. M2006-02600-CCA-R3-CD, 2008 WL 3451007, at *16 (Tenn. Crim. App., at Nashville, Aug. 13, 2008)). Ultimately, the Tennessee Supreme Court in Pylant concluded that "[a]lthough this Court continues to believe that questions concerning the admissibility of evidence are reviewed under an abuse of discretion standard, we note that, in this instance, the post-conviction court committed error under either standard of review." Pylant, 263 S.W.3d at 871.

Wiley argues that his employment application and receipt were not properly authenticated. "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). For tangible evidence, "a witness must be able to identify the evidence or establish an unbroken chain of custody." State v. Kilpatrick, 52 S.W.3d 81, 87 (Tenn. Crim. App. 2000) (citing State v. Goodman, 643 S.W.2d 375, 381 (Tenn. Crim. App.1982)). "If the proffered evidence is unique, readily identifiable, and relatively resistant to change, the foundation need only consist of testimony confirming its relevance." State v. Cannon, 254 S.W.3d 287, 309 (Tenn. 2008).

A. **Employment Application for the Knights Inn.** Wiley argues that the Knights Inn employment application was prejudicial because it showed his flight from the jurisdiction. He also contends that the employment application was not properly authenticated under Tennessee Rule of Evidence 901. Finally, Wiley asserts that the admission of the employment application was unnecessary since the presence of Wiley's fingerprints in the victim's room also explained the reason for his arrest.

At trial, Detective Larry Flair testified that at some point during his investigation he began focusing on room 325, a second room at the Knights Inn, because this was where the caretaker for the motel had been living. He began looking at room 325 because the caretaker had recently left the Knights Inn. Defense counsel objected on the ground of hearsay, arguing that this information had to have come from one of the Knights Inn employees. In a hearing outside the presence of the jury, the State asserted that Detective Flair's testimony would be hearsay, except that the detective obtained Wiley's and Scheffel's employment application from the Knights Inn showing that they had been employed at the motel, they had stayed in room 325, and they had left the motel. The applications also showed Wiley and Scheffel's home address information. The State explained that the employment application showed why the officers were searching for Wiley at the motel, even though they had yet to discover that Wiley's fingerprints were present in the victim's room. Defense counsel argued that the employment application was offered to show flight. The State responded that even though the application showed flight, evidence had already been admitted at trial that Wiley was arrested in Indiana. Defense counsel argued that the State was trying to get the evidence "through the back door with what couldn't come through the front" and that the State did not even have an individual to authenticate the employment record. The trial court determined that Wiley's

employment application was admissible because it confirmed Detective Flair's testimony that Wiley had recently left the motel. Detective Flair resumed his testimony in front of the jury and stated that he obtained a copy of Wiley's employment application from the Knights Inn motel manager. He then identified the employment application as the document he received from the motel manager. The trial court later concluded that because Wiley had signed the employment application, the application was a statement by a party opponent under Tennessee Rule of Evidence 803(1.2) and, therefore, was admissible as a hearsay exception.

We conclude, regardless of whether the abuse of discretion standard of review or the de novo without a presumption of correctness standard of review is applied, that the trial court's decision to admit the Knights Inn employment application was proper because the application is an admission of a party opponent under Tennessee Rule of Evidence 803(1.2). We further conclude that the employment application was properly authenticated by Detective Flair, who confirmed its relevance, because the application was "unique, readily identifiable, and relatively resistant to change." Cannon, 254 S.W.3d at 309.

**B. Arrowhead Motel Receipt.** Wiley also argues that the trial court should not have admitted the Arrowhead Motel receipt because it showed flight, which was extremely prejudicial. He also contends that the receipt was not properly authenticated under Tennessee Rule of Evidence 901. While he acknowledges that the trial court admitted the Knights Inn employment application as an exception to hearsay under Tennessee Rule of Evidence 803(1.2), he argues that the trial court never determined that the Arrowhead Motel receipt was admissible based on a hearsay exception.

At trial, defense counsel objected to the introduction of the Arrowhead Motel receipt during Detective Flair's testimony because it had not been disclosed during discovery and because it was hearsay. During his testimony, Detective Flair stated that he obtained a copy of Wiley's registration receipt as a part of his investigation. He then identified the receipt as the receipt that he received from the Arrowhead Motel. The receipt showed that Wiley and Scheffel checked into the Arrowhead Motel in Evansville, Indiana on June 23, 1995 at 12:19 a.m. Defense counsel acknowledged that the introduction of this receipt was not required because the State had presented other proof that Wiley was arrested at the Arrowhead Motel. At the jury-out hearing, the trial court did not address the hearsay argument and instead ruled that the receipt was not prejudicial. Defense counsel did not raise the hearsay argument again regarding this receipt.

We conclude that even if the admission of the Arrowhead Motel Receipt was improper, such error was harmless. See Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.").

**V. Admissibility of Prior Bad Act and Rebuttal Evidence of Prior Assault**. During trial, Scheffel testified that she and Wiley had a physical altercation the morning before the victim's murder. During the defense's case in chief, Wiley denied ever harming a woman in a domestic violence situation. The trial court ruled that Wiley had "opened the door" to further evidence regarding whether he had ever physically harmed a woman.

**A. Prior Bad Act.** Wiley argues that Scheffel's testimony that she and Wiley had a physical altercation the day of the victim's death was improper because this testimony was "not material to any other issue [other] than to show [Wiley's] character and [his] propensity to commit such acts." In response, the State first argues that the trial court did not abuse its discretion in admitting this evidence, and that if admission of the evidence was error, then such error was harmless beyond a reasonable doubt because of substantial evidence of Wiley's guilt. See Tenn. R. App. P. 36(b). The State also contends that the altercation between Scheffel and Wiley did not constitute a prior bad act but was necessary to prove the chain of events the day of the victim's death. We agree.

Rule 404(b) states:

> **(b) Other Crimes, Wrongs, or Acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
> (1) The court upon request must hold a hearing outside the jury's presence;
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

Assuming a trial court substantially complies with the requirements of Rule 404(b), we will review the trial court's determination for an abuse of discretion. See State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). However, if a trial court fails to substantially comply with the requirements of the rule, then the trial court's decision is not entitled to deference by the reviewing court. DuBose, 953 S.W.2d at 652.

"Rule 404 was patterned in great measure on State v. Parton, 694 S.W.2d 299 (Tenn. 1985), wherein our supreme court ruled that evidence of other crimes is generally inadmissible." State v. McCary, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). Rule 404 "establish[es] that character evidence cannot be used to prove that a person has a propensity to commit a crime." Tenn. R. Evid. 404(b); State v. Adkisson, 899 S.W.2d 626, 645 (Tenn. Crim. App. 1994). Trial courts should take a "restrictive approach [to] 404(b) . . . because 'other act' evidence carries a significant potential for unfairly influencing a jury." Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[8][e] (4th ed. 2000). The more similar the conduct or act to the crime for which the defendant is on trial, the greater the potential for a prejudicial result. McCary, 119 S.W.3d at 243 (citing State v. Bordis, 905 S.W.2d 214, 232 (Tenn. Crim. App. 1995)). Other crimes, wrongs or acts are admissible under Rule

404(b) when relevant to an issue other than the defendant's character, such as intent, motive, identity, common scheme or plan, or absence of mistake. Id.

Regarding the issue of the physical altercation between Scheffel and Wiley, we initially note that the trial court failed to fulfill any of the four requirements under Rule 404(b). Therefore, the trial court's decision is not entitled to deference by this court. Dubose, 953 S.W.2d at 652. At trial, Scheffel testified that she and Wiley got into a "little bit of a physical fight" because she wanted the keys to the car to go get some cigarettes. Defense counsel immediately objected to this statement on the ground that it constituted a prior bad act. In response, the State contended that evidence was not a prior bad act but showed the series of events leading up to the victim's murder. The trial court did not strike Scheffel's testimony but told the State not "to even discuss [the fight] any further." Scheffel resumed her testimony and stated that after the incident between her and Wiley, the victim told Wiley to take his hands off of her, and Wiley and the victim left Wiley's motel room. A short while later, Scheffel went to the victim's room at the Knights Inn to try to find Wiley, but no one answered the door. When she knocked on the door to the victim's room a second time, Wiley pulled her inside, and she saw Wiley and the victim fighting and then saw Wiley hit the victim over the head with a bottle, which knocked the victim to the ground.

Although the physical altercation between Wiley and Scheffel constitutes a prior bad act, evidence of it is relevant to an issue other than Wiley's character. Specifically, this evidence shows the motivation for Wiley and the victim to leave Wiley's room and to go to the victim's room, if not a motivation for friction between Wiley and the victim. Furthermore, the trial court instructed the State not to dwell on the physical altercation between Scheffel and Wiley. Accordingly, Wiley is not entitled to relief on this issue.

**B. Rebuttal Evidence of Prior Assault.** Wiley also contends that the probative value of the rebuttal evidence that he had committed an act of violence against Kimberly Wingate in 1987 did not outweigh it prejudicial effect and that the trial court erred in admitting that evidence. In response, the State again argues that the trial court did not abuse its discretion in admitting this evidence, and that if admission of the evidence was error, then the error was harmless beyond a reasonable doubt. See Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). Finally, the State argues that the prior assault on Kimberly Wingate was properly admitted to contradict Wiley's testimony that he had never assaulted a woman.

Prior to trial, the trial court ruled that Wiley's prior conviction in 1987 of robbery against Paul Snyder and Kimberly Wingate could not be introduced into evidence. At trial, Wiley testified that Scheffel came into their motel room, and they had a verbal argument. He said, "I have never put my hands on no woman, never been arrested for no domestic violence, or nothing like that." During a hearing outside the presence of the jury, Wiley admitted pleading guilty to the 1987 robbery of Kimberly Wingate but asserted that his co-defendant was responsible for actually assaulting Kimberly Wingate. Defense counsel argued that the State was required to accept Wiley's response under Tennessee Rule of Evidence 608(b). The State argued that Wiley had used the court's prior ruling regarding the inadmissibility of his prior conviction as a shield when he testified that he had

-40-

never committed an act of violence against a woman. The trial court ruled that because Wiley testified that "he never put [his] hands on no woman, [he] opened the door for the State to at [least] question him whether in 1987 he threw, took Kimberly [Wingate] from the car and threw her on the ground . . . ." The court also stated that it would allow the State to call Ms. Wingate to testify about whether Wiley grabbed her and threw her on the ground. Defense counsel argued that the jury would improperly consider the impeachment evidence as propensity evidence. The court responded that because Wiley had volunteered the statement, "it opens the door for the State to at least . . . impeach him with this assault on Kimberly [Wingate]." Following Kimberly Wingate's and Paul Snyder's testimony regarding the 1987 robberies, the trial court instructed the jury: "You've hear[d] testimony of this incident in 1987. This testimony may be considered by you only as it relates to the credibility of the defendant at a witness. This testimony cannot be considered by you as evidence of his guilt of the offenses for which he's now on trial."

Wiley on appeal argues that the probative value of this evidence did not outweigh its prejudicial effect under Tennessee Rule of Evidence 404(b). We conclude that even if the admission of the prior assault on Kimberly Wingate was error, then such error is harmless. See Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). In light of the strong evidence against Wiley, the evidence about Ms. Wingate's encounter with him was limited and, on balance, innocuous. Furthermore, the trial court gave a proper limiting instruction.

**VI. Sentence of Life Imprisonment Without Parole.** Wiley argues that his sentence of life without parole is excessive and disproportionate. He specifically contends that the jury erred in finding the aggravating circumstance of a prior felony involving violence to a person and that the jury erred in its weighing of the applicable mitigating circumstances against the aggravating circumstance. In response, the State contends that the jury did not abuse its discretion in imposing a sentence of life imprisonment without the possibility of parole.

In this case, the State filed a Notice of Intent to Seek Enhanced Punishment, thereby requesting a sentence of imprisonment for life without the possibility for parole. At the sentencing hearing, the State's proof consisted of an amended judgment of conviction regarding Wiley's two previous Ohio convictions for robbery, Paul Snyder's testimony regarding the facts supporting the Ohio convictions, and a victim impact statement from Betty Andrews, the victim's mother. The State used the amended judgment of conviction and Snyder's testimony to prove the aggravating circumstance that "[t]he defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person." T.C.A. § 39-13-204(i)(2) (Supp. 1995). The State submitted an amended judgment of entry from Ohio, which showed that Wiley pleaded guilty to two counts of robbery which occurred in 1987. This amended judgment was entered as an exhibit during the sentencing hearing. In addition, Paul Snyder testified that in 1987 Wiley and another man approached him in his car. Wiley asked for his wallet, and when Snyder refused, Wiley "swung" at him with his fist. Snyder locked the car doors and rolled the window up despite Wiley's attempt to break the window. Then Snyder turned the car around to get the license plate number on the car the two men were driving. As he was attempting to get this number, he saw Wiley pulling Kimberly Wingate out of her car and onto the ground.

During the sentencing hearing, the defense presented evidence of mitigating circumstances. Terry Hooper, a corrections counselor at the Turney Center Prison, testified that Wiley enjoyed the work he did at the prison and said that Wiley was not a "troublemaker." He said he could never remember seeing Wiley "angry, upset, mad, or anything." Candice Whisman, the director of sentence management services, testified that Wiley had continuously worked at various jobs in the prison since 1999. Larry D. Matthews, Jr., the education director of the Criminal Justice Center, testified that Wiley worked diligently in his janitorial job through the prison. He also said Wiley took classes in typewriting and algebra while in prison. Matthews described Wiley as a "model inmate." Tonya Suarez, Wiley's ex-wife, testified that after their divorce, Wiley kept in touch with their daughter and Suarez's son and always managed to give both children gifts at Christmas. After Wiley's arrest in 1995, Suarez said they would write to one another, and Wiley continued to send things to the children at Christmas. Suarez described him as "[v]ery considerate and thoughtful" and "[a]lways concerned about others." Josh Linvale, Wiley's brother, testified that Wiley was a father figure for him and would do "anything he could for anybody." Steven Williams, Wiley's half-brother, testified that Wiley was a father figure to him because "[h]e was just always there for us." Williams said that he had visited and written to Wiley in prison. He stated, "I hope that one day he may be able to come home, even if he is an old man." William Glenn Wiley, Jr., Wiley's twelve-year-old son, testified that he hoped his father could get out of prison so that they could spend time together. He said that his father had told him "[n]ot to do drugs," "[t]o respect people," and not to do bad things, or he "could end up where he [was]." The child stated that he "love[d] [his father], and [he] hope[d] he [would get out of prison] soon."

At the conclusion of proof at the sentencing hearing, the trial court, in accordance with section 39-13-204(j), instructed the jury regarding the mitigating circumstances in Wiley's case:

Tennessee law provides that in arriving at punishment the jury shall consider, as previously indicated, any mitigating circumstance raised by the proof which may include, but are not limited to the following:

One, the murder was committed under circumstance[s] [in] which the defendant reasonably believed to provide a moral[] justification for the defendant's conduct.

Two, the capacity of the defendant to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law were substantially impaired as a result of intoxication which was insufficient to establish [a defense] to the crime, and which substantially affected his judgment.

Three, the defendant has exhibited genuine remorse in this case.

Four, the defendant has been a loving son and father.

Five, the defendant, during the past 11-and-a-half years of incarceration, has made a significant effort to improve himself, and has shown that he has a high degree of capability for rehabilitation.

Six, any other mitigating factor which is raised by the evidence, produced by either the prosecution or the defense, at either the guilt or sentencing hearing. That is, you shall consider any aspect of the defendant's character or record, or any aspect

of the circumstances of the offense favorable to the defendant which is supported by the evidence.

At the conclusion of the sentencing hearing, the jury unanimously determined that the State had proven the aggravating circumstance beyond a reasonable doubt and sentenced Wiley to imprisonment for life without the possibility of parole.

Following the sentencing hearing, defense counsel filed a motion pursuant to Rule 33(d) of the Tennessee Rules of Criminal Procedure requesting that the trial court, as the thirteenth juror, set aside Wiley's sentence on the ground that the mitigating circumstances outweighed the one aggravating circumstance in this case. At the hearing on this motion, defense counsel contended that the one aggravating circumstance based on convictions that were twenty years old did not outweigh the numerous mitigating circumstances in this case. The trial court first responded that it did not believe that the thirteenth juror rule applies to sentencing. Second, the trial court stated that it did not believe that Wiley's sentence was proportionate but felt that Rule 33(d) did not allow the trial court to engage in a proportionality review in assessing the juror's verdict regarding sentencing. Ultimately, the trial court approved the jury's verdict regarding a sentencing of life imprisonment without the possibility of parole.

In a case such as this, where the State does not seek the death penalty, the following sentencing procedure must be followed:

> In any first degree murder case in which the state does not seek the death penalty but is seeking imprisonment for life without the possibility of parole as the maximum punishment, should the jury find the defendant guilty of first degree murder, the jury shall fix the punishment in a separate sentencing proceeding to determine whether the defendant shall be sentenced to imprisonment for life without the possibility of parole or imprisonment for life. Such sentencing proceeding shall be conducted in accordance with the provisions of § 39-13-204, excluding references to the death penalty.

T.C.A. § 39-13-207(a) (Supp. 1995). If the jury unanimously determines that the State has not proven any of the statutory circumstances beyond a reasonable doubt, then the trial court shall sentence the defendant to imprisonment for life. See id. § 39-13-207(b) (Supp. 1995). However, if the jury unanimously determines that the State has proven one or more of the statutory aggravating circumstances, then the jury shall, in its discretion, sentence the defendant to either imprisonment for life or to imprisonment for life without the possibility of parole". See id. § 39-13-207(c) (Supp. 1995). In exercising its discretion, the jury is required to "weigh and consider the statutory aggravating circumstance or circumstances proven by the state beyond a reasonable doubt and any mitigating circumstance or circumstances." See id. § 39-13-207(d) (Supp. 1995). "The statute does not require the jury to determine that the aggravating circumstances proven outweigh the mitigating circumstances by any specific level of proof to impose a sentence of life imprisonment without the possibility of parole." State v. Harris, 989 S.W.2d 307, 317 (Tenn. 1999) (citing T.C.A. § 39-13-204(f)(2) (Supp. 1995)).

Upon appeal, this court will first "consider any errors assigned" and then "review the appropriateness of the sentence." See id. § 39-13-207(g) (Supp. 1995). This court shall determine that a sentence of imprisonment for life without parole is appropriate "if the state proved beyond a reasonable doubt at least one (1) statutory aggravating circumstance contained in § 39-13-204(i), and the sentence was not otherwise imposed arbitrarily, so as to constitute a gross abuse of the jury's discretion." Id.

Our review of the record shows that the State proved beyond a reasonable doubt the aggravating circumstance that Wiley had been previously convicted of one (1) or more felonies whose statutory elements involve the use of violence to the person. Upon this record and after considering the mitigating circumstances in this case, there is no indication that the jury grossly abused its discretion or arbitrarily imposed the sentence of life imprisonment without parole in Wiley's case. Rule 33(d) states, "The trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." Tenn. R. Crim. P. 33(d). We further conclude, upon our review of the record, that the trial court did not err in denying the Rule 33(d) motion to set aside Wiley's sentence on the ground that the mitigating circumstances outweighed the one aggravating circumstance in this case. Accordingly, Wiley is not entitled to relief on this issue.

**VII. Failure to Appoint Co-Counsel.** Wiley contends that he should have received co-counsel because he faced and received a sentence of life without parole, even though the State did not seek the death penalty in his case. He argues that the trial court's failure to appoint co-counsel in this case prejudiced him. In response, the State argues that Tennessee Supreme Court Rule 13 only permits one attorney to be compensated in non-capital cases. In addition, the State contends that Wiley cannot prove that he was prejudiced because two attorneys represented him in the innocence and sentencing phases of his trial.

Defense counsel filed a motion requesting the appointment of co-counsel on July 7, 2006. At the hearing on this motion, Ross Alderman, a public defender for Davidson County, testified that the public defender's office always assigns two attorneys to life imprisonment without parole cases because they are procedurally indistinguishable from capital cases. In addition, he said that it is in the client's best interest to have one attorney focused on innocence the phase and a second attorney focused on the sentencing phase. Alderman stated that he did not know of any life imprisonment without parole cases at the public defender's office that were tried with one defense counsel.

During the motion hearing, defense counsel acknowledged that Tennessee Supreme Court Rule 13 does not permit co-counsel in a life imprisonment without parole case; however, she asserted that there was not a "fundamental difference" between a capital case and a life imprisonment without the possibility of parole case. The trial court reminded defense counsel that it had authorized an investigator and a mitigation specialist. Defense counsel responded that the trial court could have authorized the investigator and mitigation specialist if Wiley had been represented by the public defender's office, where he would have been represented by two attorneys. The trial court also noted that there is more time to try a life imprisonment without parole case because the jury is not sequestered. The trial court denied the request for co-counsel on the ground that it could not find a due process or Sixth Amendment violation sufficient to override Tennessee Supreme Court Rule

13. Rule 13 states, "The court shall appoint two attorneys to represent a defendant at trial in a capital case." Tenn. S. Ct. R. 13 § 3(b)(1). On the other hand, "[c]o-counsel or associate attorneys in non-capital cases shall not be compensated." Id. at § 2(b). In other words, "[s]ection 2(b) unequivocally provides that only one attorney will be compensated in non-capital cases." Expl. Comment, Tenn. S. Ct. R. 13 § 2. In light of the clear language of Rule 13 and the fact that he had the assistance of two attorneys at trial, we conclude that Wiley is not entitled to relief on this issue.

## CONCLUSION

Upon review of the record, we conclude that the trial court properly denied Wiley's motion for judgment of acquittal and the evidence was sufficient to convict him of first degree felony murder and especially aggravated robbery; that Wiley should not be granted a new trial because of the alleged Brady or Rule 16 violations; the trial court did not err by admitting his Knights Inn employment application and that any error in the admission of the Arrowhead Motel receipt was harmless; that the trial court did not err in admitting prior bad act evidence in the form of Scheffel's testimony and the rebuttal evidence of a prior assault; that Wiley's sentence of life imprisonment without the possibility of parole was not excessive; and that the trial court did not err in denying his request for co-counsel. The judgments of the trial court are affirmed.

_____
CAMILLE R. McMULLEN, JUDGE